**HBE LEASING CORPORATION, Signal Capital Corporation, Reyna Leasing Corporation, Reyna Financial Corporation, and John Hancock Leasing Corporation, Plaintiffs,**

v.

**Hiram H. FRANK, Hiram J. Frank, Henry J. Sandlas III, Henry J. Sandlas IV, Bruce Huggins, Kelby Kuney, Gary Bowers, H.H.F. Farms, Inc., H.H. Frank Enterprises, Inc., Springbrook Grain Company, Inc., Golden Eggs Farms, Inc., Robert Ames and H.H. Frank Enterprises, Inc. Pension Plan, Defendants.**

**HBE LEASING CORPORATION, Signal Capital Corp., John Hancock Leasing Corporation, Petitioners,**

v.

**Clemence FRANK, H.H. Frank Enterprises, Inc., Hiram J. Frank, Hiram H. Frank, Gerald Lefcourt, Jay Goldberg, Michael Berger, Judd Burstein, Goldstein & Stoloff, Richard Ware Levitt and Cliff Gordon, Respondents.**

No. 88 Civ. 1724 (GLG).

United States District Court,
S.D. New York.

Nov. 2, 1993.

As Corrected nunc pro tunc Dec. 21, 1993.

---

S. Pitkin Marshall, New York City, for petitioners.

Goldstein & Stoloff, Monticello, NY (Richard A. Stoloff, of counsel), for respondents Goldstein & Stoloff, H.H. Frank Enterprises, Inc., Hiram J. Frank and Hiram H. Frank.

Edward Rubin, New York City, for respondent Clemence Frank.

Lefcourt & Dratel, P.C., New York City (Sheryl E. Reich, of counsel), for respondent Attys. Gerald Lefcourt, Jay Goldberg, Judd Burstein, Richard Ware Levitt and Cliff Gordon.

Michael G. Berger, pro se.

1. There are fewer petitioners than plaintiffs because some assigned their judgments to other plaintiffs.

2. A third aspect of the order to show cause was to avoid a transfer of $50,000 made from judg-

*OPINION*

GOETTEL, District Judge.

In proceedings supplementary to judgment, the plaintiffs/petitioners [1] move by order to show cause to declare fraudulent and void certain mortgages given by judgment debtor H.H. Frank Enterprises, Inc. to Clemence Frank and to declare fraudulent and to recover payments made to seven attorneys by H.H. Frank Enterprises, Inc. in the earlier action. With respect to these motions, with a single exception,[2] the facts are either not in dispute or are, for purposes of the motion, conceded.

The facts giving rise to the present application may be summarized as follows. The plaintiffs in the earlier action are leasing companies. Over a period of years, they paid certain of the defendants many millions of dollars for equipment, purportedly leased to egg farms which ultimately bankrupted. When the plaintiffs attempted to recover their new and expensive leased equipment, they found nothing but old worn-out chicken farming equipment. They thereafter sued the defendants, all of whom were family members or associates of Hiram H. Frank, the founder and, through most of the years in question, the leader of the Frank family businesses. By the time this suit had been commenced in 1988, the Franks were out of the egg farming business. Their family controlled corporation, H.H. Frank Enterprises, Inc., looked after their assets which included substantial real property in Sullivan County.

In March 1988, the plaintiffs sued the various defendants under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c) and (d) and for common law fraud. In November 1992, following a three month jury trial, the jury entered a verdict against nine of the defendants including the first five named defendants and H.H. Frank Enterprises, Inc.

ment debtor Hiram H. Frank to Clemence Frank in March 1989. As to this issue, it is conceded that there are material facts disputed which prohibit the decision of this application on papers.

(hereinafter referred to simply as "Enterprises"), for almost $20 million dollars with substantial interest, and punitive damages of almost $5 million dollars. The verdicts are on appeal, but no supersedeas bond has been posted. Virtually nothing has been collected on the judgments. The plaintiffs/judgment creditors proceed here pursuant to New York's C.P.L.R. § 5225(b) and Fed.R.Civ.P. 69(a).

Respondent Hiram J. Frank is the son of Hiram H. Frank. During the time this case was in litigation, he purported to be the most affluent member of the Frank family.[3] During the period of litigation, he purportedly loaned $1.7 million dollars to Enterprises. Enterprises, in turn, paid for the personal needs of the members of the Frank family including medical and accounting expenses (as well as other more frivolous things) and, most pertinent to this application, the legal fees of the Franks and all of the other defendants in the action. Each individual defendant had a separate attorney (who, in some instances, also represented a corporation owned by that individual), and more than three-quarters of a million dollars in the fees of other parties was paid by Enterprises. In addition, another three-quarters of a million dollars was paid by the H.H. Frank Enterprises Pension Plan. However, the Pension Plan is not a judgment creditor in this case, and no relief is directly sought from it at this time. There is, also, a separate action pending before Judge Brieant entitled *HBE Leasing Corporation, et al. v. Hiram J. Frank, et al.*, 93 Civ. 1597, which attacks other interfamily transfers purportedly made by Hiram J. Frank in fraud of creditors. (These involve more than $2 million dollars.)

3. It would appear that his affluence came from transfers from his father of his father's business interests. However, for purposes of this motion, it is immaterial whether the funds really emanated from Hiram H. Frank or his son, Hiram J. Frank.

4. Lena Farms, which was owned by Hiram J. Frank, had taken out a FMHA mortgage, which was delinquent. The government had sued on this mortgage. Lena Farms was a trade style, and Hiram J. Frank was personally obligated on the note so that in excess of a half million dollars

### The Claim Against Clemence Frank

While respondent Clemence Frank was not a defendant in the earlier action, she is the wife of Hiram H. Frank and the mother of Hiram J. Frank. She was also the next door neighbor and friend of defendant Henry J. Sandlas III and his wife. She and her husband have resided for many years on what is for Sullivan County a rather lavish estate. However, title to the estate is in Enterprises. For many years, she was a Director of Enterprises. As such, it is claimed that she accumulated substantial independent wealth. In 1992, shortly before this case went to trial, her son, Hiram J. Frank, needed money to settle a government tax suit involving some properties not defendants in this action.[4] Instead of loaning her son money from her independent wealth, Clemence Frank purportedly loaned $350,000 to Enterprises which then gave her a $250,000 mortgage on the estate which she and her husband occupied. Enterprises then purportedly paid the money to Hiram J. Frank as a partial repayment of the $1.7 million dollars which he categorized as loans to Enterprises (which had been used to pay the joint legal fees, as well as other expenses of the Franks and their associates). Hiram J. Frank used this money to settle the government's suit. A couple of months later, Enterprises gave Clemence Frank a mortgage for $100,000 on other related properties near the Franks' home.[5] When the judgment creditors took steps to have a Receiver appointed for these properties in order to collect on their verdict, Clemence Frank went to State Court and had a Receiver appointed first, purportedly to protect her mortgage interests. This move has blocked the attempts of the judgment creditors to sell the Frank's estate, resulting in the instant application.

was owing to the government. He had the opportunity to settle the action for a quarter of a million dollars if prompt payment was made. He argues that this assisted in preserving one of his assets which would otherwise not be available for execution by the judgment creditors at this time. The plaintiffs are pursuing that property in a separate foreclosure action.

5. The $250,000 mortgage encumbers what is called the Lower Farm while the $100,000 mortgage is on what is known as the Upper Farm.

Clemence Frank argues that the $350,000 that she gave to Enterprises was her own money and that it is not subject to the lien of judgment creditors. For purposes of this motion, the plaintiffs will assume that she had her own separate assets. She further argues that she did not know where the money would go after it went into Enterprises, whose shareholders were her children.[6] The court finds this claim to be incredible, but our disbelief is not critical to the decision of this aspect of the motion. Her son, Hiram J. Frank, who benefitted from the transfer, argues initially that the transactions are related to those in the new action brought against him pending before Judge Brieant and that this entire proceeding should be referred to Judge Brieant.[7] While we do not doubt that most of the Frank family's finances and transactions have an inter-relation, the ones challenged in this proceeding are not a part of the complaint before Judge Brieant. Consequently, we deny that application.

A threshold argument made in opposition to the application directed against Clemence Frank is that a proceeding supplementary to judgment should not be used to cancel a mortgage even if the mortgage was fraudulently obtained. However, the petitioners alternatively seek a money judgment for that amount. The net effect of this approach is the same. If a money judgment is granted for the $350,000, it satisfies the mortgages.

The respondents in this proceeding have not disputed the fact that Enterprises, from the time this case was commenced to the present time, existed solely as a conduit for Frank family personal assets and that many of the payments it made benefitted the Frank family personally. Indeed, even before the return of the $25 million dollar judgment the potential and thereafter judgment debtors had been busy transferring family assets to members of the family who were not defendants in the suit. For that matter, Clemence Frank was also a Trustee of the Pension Plan, as well as a Director of Enterprises, and must have been aware that those two organizations paid out a million and a half dollars in funds for the defense of other defendants.

■ Clemence Frank's counsel concedes that a stockholder's loans to his own company will be treated as a capital contribution under the equities when a company is deemed undercapitalized. *Pepper v. Litton,* 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939); *Taylor v. Standard Gas & Elec. Co.,* 306 U.S. 307, 59 S.Ct. 543, 83 L.Ed. 669 (1939); *Re MultiPonics, Inc.,* 622 F.2d 709 (5th Cir.1980). (This is known as the "Deep Rock Doctrine.") Although Enterprises had a couple of million dollars in assets during the pertinent period, it was confronted with a claim in litigation which ultimately resulted in a judgment for more than ten times its total assets. Were it not for his personal involvement in both sides of the situation (as the owner of Enterprises and as a personal defendant in the various litigations), Hiram J. Frank would not have loaned almost $2 million dollars to Enterprises. Clemence Frank concedes that Hiram J. Frank could not legally have lent money to Enterprises which was then used for his own purposes, but argues that her innocent knowledge of the transactions sterilizes them, giving her valid mortgages with which to protect her homestead.

■ Under New York's Debtor and Creditor Law, § 273–a, creditors have two separate approaches to avoid transfers. Under the first, they may void any transfer made without fair consideration regardless of the intent of the parties. Under the second approach, even if there was fair consideration, the party in question must prove that the consideration was taken in good faith. Clemence Frank was both an intimate family member of the judgment debtors, and an insider of the corporate debtor Enterprises. Indeed, she claimed her independent wealth came from her relationship to it. She argues, however, that she severed her connec-

---

6. The majority of stock in Enterprises is owned by her son, Hiram J. Frank, and the remainder by her daughter, Susan Frank Alpert.

7. One obvious reason for making this application is that Judge Brieant has put the new action on hold to await a disposition of the pending appeal which is months, if not years, away.

tion and directorship with Enterprises in 1990 and, therefore, should no longer be treated as an insider.[8]

██ We are not impressed with this argument. Her advances to Enterprises must also be treated as capital, and the mortgages obtained as being equitably subordinated to the judgment creditors' claims even had the funds been used for legitimate corporate purchases rather than to bail her son out of a potentially large government obligation. This conclusion is supported by the "Deep Rock Doctrine" described above. In the spring of 1992, as the trial of this action was finally about to commence, Enterprises faced a possible judgment ten times its assets and was, therefore, seriously undercapitalized. No outside source would have conceivably lent it money. The funds advanced, therefore, were capital contributions and not loans. The mortgages received were a charade designed to protect the elder Franks' homestead.[9] Thus, Clemence Frank's mortgages are void under § 273 of the Debtor and Creditor Law as being given without consideration.

██ A second independent reason for voiding the mortgages is that they were, in fact, used to repay the loans of Hiram J. Frank which themselves were not loans but were rather capital advances. Under New York's Debtor and Creditor Law, § 273–a, it is constructive fraud to loot one judgment creditor for the benefit of another judgment creditor who ends up judgment proof. Clemence Frank cannot avoid this by simply saying that she did not know what use her son and his company were going to make of the monies.

The Franks argue that the monies which they advanced Enterprises had the overall effect of benefitting it rather than looting it. However, the net effect over the years, starting in 1988, is that Enterprises lost almost three-quarters of a million dollars that it had at that time.[10] Clemence Frank, in her affidavit, acknowledges that she was aware of Enterprises' "massive legitimate obligations of its own, including obligations for its own legal fees and for all of the running expenses associated with the upkeep of the properties. At the same time, Enterprises had virtually no income." Clemence Frank affidavit at 5. Although Clemence Frank did give money to Enterprises in return for her mortgages, the transfer cannot be viewed independently from the context surrounding it. While there was clearly nothing improper in a mother loaning her son money in order to pay off his federal obligations (or even to pay his attorney's fees), she could have and, in effect, did do this directly. The only reason Enterprises was used as a conduit was to continue a pattern of encumbering the corporation to the benefit of the defendants and Clemence Frank. The mortgages she obtained to protect her home are a nullity.

Clemence Frank's counsel argues that the judgment creditors have not been prejudiced by these transactions and that a demonstration of prejudice is necessary. The judgment creditors are clearly being hindered in their attempts to dispose of the Franks' estate by the intervention of her state court receivership based on the illusory mortgages. Moreover, while the loans may have prevented the government from seizing Lena Farms a couple of years ago, Hiram J. Frank has conveyed away virtually all of his assets (to his wife, to his mother and to his attorneys for future services—matters involved in the litigation before Judge Brieant) with the result

---

8. There is a dispute as to when she surrendered her directorship, the petitioners alleging it was in 1991 and that she got director's fees through 1992. She clearly continued to be a trustee and beneficiary of the Pension Plan, as well as being the mother of the shareholders of Enterprises and the wife and mother of two of the judgment debtors.

9. The elder Franks purportedly lease their home from Enterprises. However, the rent which they pay for two houses with pools, tennis courts, and other amenities, is far less than the rental value

of the estate, even under the presently depressed Sullivan County real property standards. Indeed, the cost of insurance, taxes, maintenance, and bookkeeping expenses, far exceed the rent paid. For that matter, the rentals received from other real property owned by Enterprises and rented to Frank family employees and associates (totalling $30,000 annually) far more accurately reflects the value of the properties used by the elder Franks.

10. Enterprises' 1988 equity was $1,857,000 while its 1992 equity is $1,150,000.

that little has been preserved. This is constructive fraud under § 273-a. Even if Clemence Frank was unaware of her son's intentions, the mortgages were not taken in good faith but to protect the elder Franks.

To summarize, Clemence Frank was an insider for Deep Rock purposes and a family member to whom the burden of proof has shifted—a burden she has not met. Her contributions were funded by Enterprises' directors' fees even after she purportedly resigned as a director in 1990. She continued as a trustee of the Enterprises Pension Plan which also funded counsel for other defendants. At the time she was admittedly a director of Enterprises, it received purported loans from her son while paying family expenses which were clearly not corporate obligations. Her estate was owned by Enterprises while she was one of its directors and she was paying only $3,000 a year for its two houses, pools, ponds, tennis courts, and grounds kept up by groundkeepers and tree surgeons at corporate expense. When we sift the circumstances surrounding the claim, it would be unjust and unfair to allow the debtors' estate to avoid its obligations based on the equities of the case, the history of spoilation, mismanagement, and the faithless stewardship of the affairs of the debtor. *Pepper v. Litton,* and other cases cited *supra.* Consequently, the petitioners' (judgment debtors') application with respect to Clemence Frank is in all respects granted.

### Attorneys' Fees

■ As indicated above, there were seven attorneys who represented the various individual defendants. Shortly prior to trial, they reshuffled themselves which, in some instances, changed the defendants whom they represented. All of the attorneys for all of the parties were paid by Frank family funds either through Enterprises or the Pension Plan. Along with the fees paid to the

attorneys representing Enterprises itself and the Pension Plan, the total of attorneys' fees paid out in this action to defense counsel is in the vicinity of $2 million dollars. Of this, $775,722 was paid by Enterprises to attorneys for other parties.[11] Petitioners argue that the other defendants were owed nothing by Enterprises, and no benefit was provided to Enterprises by these payments. We do not agree with this position. It was obviously to the benefit of each defendant to have a unified defense and to have everyone adequately represented. Moreover, it was to the benefit of all defendants to make it appear to the jury that each was being separately represented. Concededly, however, the amount of fees generated by this approach would far exceed the benefit of the maneuver even had it been successful.[12]

Petitioners also argue that no reasonably disinterested party would have expended so much corporate funds simply to assist other individuals and corporations even where they had a community of interest. While there is something to this argument, it founders on the fact that no one would reasonably have predicted when the action commenced in 1988 that some $2 million dollars would be expended in attorneys' fees, of which almost a half came from Enterprises.

The creditors argue that in light of the fact that they were seeking and did recover ten times more in damages than Enterprises had in assets, it was an insolvent corporation for purposes of analyzing its creditors' rights. Essential to the petitioners' position is the fact that although the Franks were laying out the money, it was funneled back through Enterprises and, therefore, became the assets of Enterprises which should not have been spent in such a fashion.

The various defense attorneys from whom these funds are sought personally have a

---

**11.** Respondents dispute this figure, arguing that certain of the funds were paid at times that those attorneys were, in fact, representing Enterprises. In light of the decision in this matter, the exact amount is immaterial.

**12.** Defense counsel point out that other than at trial the seven attorneys did not duplicate each

other's services. Often only one of them attended a deposition and occasionally only one set of motion papers were submitted on behalf of all defendants. However, the motion practice by defense counsel, which appealed virtually every Magistrate Judge's ruling, was clearly excessive.

number of responses.[13] One argument advanced by the respondents is that it was petitioners' fault that the litigation proceeded for so many years rather than being settled although they were advised that the defendants had only limited assets which might be used up in the litigation.[14] Even assuming that the judgment creditors erred in not seeking an early settlement, that decision has no legal import.

Defendants also point out that Enterprises and Hiram J. Frank were the only defendants with any disclosed substantial assets. Frank has claimed that he was the sole target of this litigation. Since all the defendants could be jointly and severally liable, it behooved both Enterprises and Hiram J. Frank, as the most solvent parties, to defend the litigation. While this approach seems reasonable, it does not impact on the petitioners' argument that since monies went through Enterprises it was a waste of corporate assets. However, even assuming it was a waste, it was not fraudulent within the meaning of D.C.L. § 273–a and, indeed, it was openly disclosed to petitioners during the litigation. Indeed, had Hiram J. Frank's predecessor counsel foreseen this situation, it could have been avoided by the simple method of having Hiram J. Frank pay the fees and not Enterprises.

One can question the wisdom of retaining some of the attorneys, a number of whom were prominent, expensive New York City criminal lawyers. However, the selection of the proper counsel is always a matter of individual choice. The plaintiffs have never disputed that *bona fide* legal services were rendered by the attorneys to one or more of the defendants or that their disbursements were not actually incurred.

Having presided at the very lengthy trial and considered the numerous motions, we conclude as a matter of fact that in a conspiracy case such as this, Enterprises did receive a benefit from the funds it laid out on behalf of the other parties, albeit it paid far too high a price for that benefit.[15] Nor do we believe that there was anything unethical in this approach in light of the common interest of all of the defendants and their right to have a joint defense if it was to their benefit.[16]

The final and overriding consideration, and one not coherently addressed by respondent defense counsel, is the new burden that the petitioners' approach would place upon trial lawyers. The few cases cited in support of petitioners' position come from far different situations, not merely the frittering away of remaining assets by insolvent judgment debtors defending the claims against them. Petitioners acknowledge that Enterprises could properly expend funds to defend itself. They maintain, however, that the total amount expended was unreasonable in light of the assets of Enterprises. One weakness with this position is that, even at the time the litigation was commenced, all of the defendants collectively lacked assets to pay the ultimate judgment rendered. To accept the petitioners' argument that anyone who is sued for more than he has cannot hire attorneys to defend the claim, because it is potentially the judgment creditors' money he is spending, would be to deprive all defendants here of counsel.

We know of no authority which requires attorneys to question the financial resources

---

13. Their threshold position is that the matter should be transferred to Judge Brieant as a case intertwined with the instant petition or that the petition should be stayed pending appeal of the jury verdict. The court rejects both of these suggestions for the same reasons Clemence Frank's application was denied.

14. The plaintiffs maintained that they had been defrauded of over $6 million dollars. With treble damages and interest they were seeking $20 million dollars plus punitive damages. Apparently, the defendants suggested a payment of $2 million dollars in an early stage of the litigation and, immediately before the case was tried, offered a

half million dollars, claiming that that was their remaining worth.

15. It should be noted that certain of the defendants such as Gary Bowers, an outside accountant, had a common law right to look to Enterprises for indemnification and contribution and were, therefore, entitled to receive legal services at Enterprises' expense. The action against Bowers was dismissed by the court.

16. We do not consider, nor is the issue raised here, as to the ethics of an attorney being paid by someone other than his client in a conspiracy charge where a client might have been better off making some accord with his accusers.

of their clients in paying their legal fees. Were we to accept the judgment creditors' approach there would have come a point in time, perhaps early on in the litigation, when the attorneys should have said that Enterprises had paid out too much in attorneys' fees just for its own defense, and they could not accept any more fees from Enterprises. Since obviously they were not going to continue as *pro bono* counsel, they would have had to have sought to withdraw. Since a corporate party cannot proceed *pro se*, this would have resulted in a default judgment against Enterprises. That obviously is not a path that an attorney can ethically follow. Nor do we believe it is required that attorneys defending civil claims evaluate the financial status of their clients before accepting payment of their fees. To place such a burden on attorneys would add intolerably to their problems.[17]

For all of the foregoing reasons, we find that the defense lawyers do not have to pay to the judgment creditors the fees which they received from the clients, and more particularly, Enterprises, prior to the rendition of the judgment.[18]

SO ORDERED.

---

**17.** A defense lawyer's initial consideration is whether the client is going to have the funds to pay his legal bills, which sometimes proves not to be the case. They should not also have to stop to worry whether potential judgment creditors will be paid.

**18.** We take no position upon the issues pending in the action before Judge Brieant or upon the matter of appellate fees and costs.