**HBE LEASING CORPORATION, Signal Capital Corporation, Reyna Leasing Corporation, Reyna Financial Corporation and John Hancock Leasing Corporation, Plaintiffs–Appellees,**

v.

**Hiram H. FRANK, Hiram J. Frank, Henry J. Sandlas III, Henry J. Sandlas IV, Bruce Huggins, H.H.F. Farms, Inc., H.H. Frank Enterprises, Inc., Golden Egg Farms, Inc., and Robert Ames, Defendants–Appellants.**

No. 557, Docket 93–7085.

United States Court of Appeals,
Second Circuit.

Argued Dec. 17, 1993.

Decided April 13, 1994.

Frederick T. Davis, New York City (Stephen M. Cowherd, Shearman & Sterling, S. Pitkin Marshall, New York City), for plaintiffs-appellees.

Judd Burstein, New York City (Jay Goldberg, Richard Ware Levitt, New York City, of counsel), for defendants-appellants Hiram H. Frank and Golden Egg Farms Inc.

Gerald B. Lefcourt, New York City, for defendants-appellants Henry J. Sandlas III and Henry J. Sandlas IV.

Sheryl E. Reich, New York City, for defendants-appellants Hiram J. Frank and H.H. Frank Enterprises, Inc.

Richard A. Stoloff, Monticello, NY, (Goldstein & Stoloff, Monticello, NY), for defendants-appellants Bruce Huggins and H.H.F. Farms, Inc.

Cliff Gordon, Monticello, NY, for defendant-appellant Robert Ames.

Before: MAHONEY and WALKER, Circuit Judges, and EGINTON, District Judge.*

WALKER, Circuit Judge:

Defendants in this action appeal from a judgment of the United States District Court for the Southern District of New York (Gerard L. Goettel, *Judge*) 837 F.Supp. 57. After a three-month jury trial, defendants were found jointly and severally liable under the civil provisions of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*, in the amount of $6,556,714, which amount was then trebled

---

* The Honorable Warren W. Eginton, United States District Judge for the District of Connecticut, sitting by designation.

pursuant to 18 U.S.C. § 1964(c). The defendants were also found liable for state common law fraud in the identical amount of $6,556,714, allocated among the various defendants. Finally, the jury assessed punitive damages in the amount of $5 million, similarly allocated among the various defendants. On appeal, defendants argue, *inter alia*, that the district court erred by permitting the plaintiffs to pursue a theory of liability allegedly precluded by the pretrial order and by forbidding defense counsel from mentioning before the jury RICO's treble damage and attorneys fees provisions.

For the reasons stated below, we affirm the judgment of the district court in its entirety.

## BACKGROUND

Defendants are individuals and companies who were engaged in commercial egg farming. Egg producing is generally a labor intensive enterprise, for both chickens and humans alike. However, large egg-producing farms can minimize the human labor costs by utilizing automated equipment to harvest the eggs. This apparatus, a vast contraption comprised of a series of coops, cages, and conveyor belts, enables just a few workers to manage the egg production for thousands of chickens. The dominant manufacturer of this automated egg-producing equipment is "Big Dutchman," and it is Big Dutchman equipment which is at the center of this controversy.

Plaintiffs are large and prominent leasing companies. Plaintiffs' complaint alleged that the defendants engaged in a large-scale scheme to defraud plaintiffs over several years in a series of phony farm equipment leasing transactions.

Between 1982 and 1985, principal defendants Hiram H. Frank and his son Hiram J. Frank solicited the various plaintiffs to purchase new Big Dutchman equipment from defendant H.H.F. Farms, Inc. The plaintiffs would in turn lease the equipment to numerous egg-producing farms in order to replace outmoded Big Dutchman machines installed on those farms in the 1960's. This transaction would benefit both parties: the farms would benefit by obtaining the new equipment without having to pay the full price at the time of acquisition and the plaintiffs would benefit by financing the farms' acquisition of the equipment, and by reaping an Investment Tax Credit for the purchase price of the equipment. In the end, the parties consummated some fourteen separate leasing transactions in which the defendants purported to sell plaintiffs some $5 million worth of equipment.

The arrangement operated smoothly until mid–1985, when the defendants started missing lease payments. By December 1985, all leasing payments to the plaintiffs ceased. The plaintiffs subsequently learned that the defendants had systematically divested the farms of cash and liquid assets, thus making repayment of the leases impossible as a practical matter.

In the aftermath of the defaults, plaintiffs more closely investigated the defendants' operation and eventually reached two conclusions: first, they realized that both the equipment vendor and lessee farms were controlled by defendants Hiram H. Frank and his son; and second, they came to believe that in fact no "new" equipment ever existed. Plaintiffs alleged at trial that no actual equipment was ever purchased or installed, and that the entire leasing arrangement was a sham concocted by the individual defendants. Since there is no challenge as to the sufficiency of the evidence, nor could there be on this record, there is no need to recount in detail the evidence adduced during the lengthy trial in support of the plaintiffs' allegations of fraud. However, some key components of that evidence are noteworthy. Plaintiffs offered testimony that they were never actually able to inspect this "newly installed" equipment on site because the defendants warned that any foreign presence on the farms would risk the destruction of the entire flock through the spread of the avian flu. One of defendants' workers testified that during his tenure at one of the farms from 1976 to 1986 no "new" equipment was ever installed. Another worker testified that just before the plaintiffs arrived for a post-default inspection of the equipment, the defendants hurriedly sanded and repainted

the old equipment to give it the appearance of being new. Finally, shortly after the default but before suspecting any fraud, plaintiffs hired an egg-farming equipment dealer to inspect the "new" equipment and determine a likely resale value. He testified that, upon visiting the farms, he was astonished to realize that the "new" equipment he had been hired to inspect was the identical equipment he had himself installed in the 1960's. He pointed out several graphic instances where he had personally "customized" parts of the existing equipment during its installation some twenty years earlier.

The plaintiffs called virtually all of the individual defendants to testify. These defendants vigorously denied any wrongdoing. They maintained at trial that they actually installed older but unused "inventoried" equipment following the lease transactions. It was clear even from defendants' own records that no "new" equipment was purchased at the time of the leases, although the lease invoices specified "NEW BIG DUTCHMAN" equipment. Thus defendants contended that equipment purportedly installed during the 1980's had actually been purchased in the 1960's and put in storage.

## DISCUSSION

Defendants raise several issues on appeal, only two of which require discussion. First, defendants claim that the district court erred by permitting the plaintiffs to pursue a theory of liability in the course of the trial in violation of the pretrial order issued pursuant to Fed.R.Civ.P. 16. Second, they argue that the district court erroneously prohibited defense counsel from discussing RICO's treble damage and attorneys fees provisions before the jury. Both arguments lack merit.

*I. The Alleged Rule 16 Violation*

■ Defendants argue that the district court's pretrial order estopped plaintiffs from pursuing a particular theory in response to defendants' "inventory" defense. Although the plaintiffs consistently argued that the "new" Big Dutchman equipment was fictitious, they suggested that even if older "inventoried" equipment was installed, the lease transactions were nonetheless fraudulent because the agreements specified that the old equipment would be replaced by new equipment.

In their original complaint, plaintiffs listed twenty-seven leasing transactions as to which plaintiffs alleged the equipment "did not exist or was sold at inflated prices." Noting the apparent contradiction in the two theories, the district court required that the plaintiffs settle on a single theory. Although not stated clearly in the original complaint, of these twenty-seven transactions, fourteen consisted of leases where plaintiffs alleged that no "new" equipment existed, and the remaining thirteen involved transactions in which the plaintiffs acknowledged that equipment was in fact installed, but that the equipment was variously old, used, and/or virtually worthless. Subsequently, as reflected in the Revised Contentions that became a part of the Rule 16 pretrial order, the plaintiffs distinguished the two groups of transactions and stated unequivocally that "[e]ach of the 14 sale and lease transactions identified . . . was a sham in that the new and unused equipment HHF Farms purported to sell to the plaintiffs did not exist." The remaining thirteen transactions were dropped from the action as a basis for liability, although one of these latter transactions was admitted to prove the defendants' conspiratorial relationship.

At trial, plaintiffs presented substantial evidence that no equipment actually existed as to the fourteen leasing transactions. The defendants countered with their inventory defense. In a few instances, plaintiffs voiced their views that the inventory defense was in fact no defense at all because the lease agreements, upon which they relied, specified new equipment and not old, inventoried equipment. Defendants objected and argued that plaintiffs should not be allowed to take the position that the inventory defense was fraudulent because it would improperly broaden the scope of liability of the defendants. The trial court did not intercede and refused to instruct the jury that the only proper basis for liability would be if they found that the equipment in the fourteen transactions did not exist.

■ A trial court is given broad discretion in managing a trial, *Cross & Cross Properties v. Everett Allied Co.,* 886 F.2d 497, 503 (2d Cir.1989), and this discretion includes a certain amount of latitude to deviate from the terms of the pretrial order. *See Napolitano v. Compania Sud Americana de Vapores,* 421 F.2d 382, 386 (2d Cir.1970); *see also* 6A Wright, Miller & Kane, *Federal Practice & Procedure,* § 1527, at 279 (2d ed. 1990) ("Although federal judges generally recognize the binding effect of the pretrial order, this does not mean that it is rigidly and pointlessly adhered to at trial. The application of preclusion always is viewed as a matter of judicial discretion.").

This is not a case where the plaintiffs pulled the rug from under the defendants by completely shifting their theory of liability at trial. To the contrary, plaintiffs in this case never dropped their principal argument, supported by substantial evidence, that no equipment actually existed. Indeed, their case-in-chief relied solely upon it. Here, the district court simply permitted the plaintiffs to rebut the inventory defense by pointing out that even if the inventory defense was established the transaction would still be fraudulent. We do not find this to be an abuse of discretion. Nor do we think it was error for the district court to refuse to instruct the jury specifically that the only basis for liability could be a finding that the equipment never existed. The jury could consider it to be just as fraudulent for defendants to represent to plaintiffs that they were purchasing brand new equipment, yet install only 20–year–old, outmoded equipment that would provide plaintiffs with virtually no security value on the leases. That the entire defense was constructed around this inventory defense does not alter the fact that it would also be an acceptable basis of liability for fraud.

## II. RICO's Treble Damage and Attorneys Fees Provisions

■ Defendants contend that the district court erred when it precluded them from putting before the jury RICO's treble damage and attorneys fees provisions. They argue that they were deprived of valuable impeachment material that would demonstrate that plaintiffs' witnesses had a motive to lie in order to obtain the bonanza of a treble damage award as well as attorneys fees under RICO. They submit that this Circuit's precedents make it reversible error for a district court to exclude from the jury mention of these RICO provisions.

■ Plaintiffs respond that while the law in this Circuit is admittedly less than crystal clear on the point, virtually every other jurisdiction views such mentioning of treble damage provisions, in both the RICO as well as the antitrust contexts, as improper. We agree with the plaintiffs and now remove any doubts within our own Circuit that district courts should not as a general matter permit reference before the jury to the fact that any eventual award will be trebled under the statute or that attorneys fees will be awarded to a prevailing party. Because our decision today might arguably be construed as a departure from past caselaw, this opinion has been circulated to the members of the court prior to filing.

While the defendants may have been deprived of some incremental benefit in not being able to use the RICO provisions for impeachment purposes, the question is one of degree. Plaintiffs were seeking over $5 million in compensatory damages plus punitive damages. Defendants were free to argue that the amount of damages before trebling provided a powerful incentive to fabricate. Any incremental benefit of allowing comment before the jury of the RICO trebling and attorneys fees provisions as additional reasons to lie would be greatly outweighed by the costs of permitting such mention. Reference to treble damages and attorneys fees is irrelevant to the jury questions of liability and damages and may tend to confuse or prejudice a jury into reducing its eventual award, thus frustrating Congress's goal of deterring improper conduct by assessing treble damages and attorneys fees.

Every authority brought to this court's attention upholds excluding references to trebling and attorneys fees in the RICO context. *See, e.g. Liquid Air Corp. v. Rogers,* 834 F.2d 1297, 1308 n. 7 (7th Cir.1987) (explaining that information regarding RICO's

trebling provision is properly excluded because it "is irrelevant to a jury's deliberations and may confuse or prejudice the jury"), *cert. denied*, 492 U.S. 917, 109 S.Ct. 3241, 106 L.Ed.2d 588 (1989); *Vidosh v. Holsapple*, No. 84CV2447DT, 1987 WL 273164, at *12–13, 1987 U.S.Dist. LEXIS 15749, at *39 (E.D.Mich. Feb. 2, 1987) ("[T]o inform the jury of a treble damage provision will cause it to adjust its award accordingly and thus distort its true function of finding damages...."); *Rhue v. Dawson*, 173 Ariz. 220, 224, 841 P.2d 215, 229 (Ct.App.1992) (informing jury of trebling provision might thwart purpose of state RICO statute by inducing jury to reduce or eliminate damage award). Likewise, commentators uniformly advise against bringing RICO's trebling provisions to the jury's attention. *See, e.g.*, 4 Sand, Siffert, Reiss & Batterman, *Modern Federal Jury Instructions*, § 84.06, at 84–74 to 75 (1993) ("As in antitrust treble damages cases, it is not appropriate to inform the jury of the trebling and attorneys fee provisions."); 3 Devitt, Blackmar & Wolff, *Federal Jury Practice and Instructions*, § 100.11, at 841 (4th ed. 1987).

Treble damages and attorneys fees are, of course, also recoverable for antitrust violations under the Clayton Act, 15 U.S.C. § 15. In that context as well, courts have uniformly concluded that mentioning treble damages and attorneys fees to the jury is improper. *See CVD, Inc. v. Raytheon Co.*, 769 F.2d 842, 860 (1st Cir.1985), *cert. denied*, 475 U.S. 1016, 106 S.Ct. 1198, 89 L.Ed.2d 312 (1986); *Arnott v. American Oil Co.*, 609 F.2d 873, 889 n. 15 (8th Cir.1979), *cert. denied*, 446 U.S. 918, 100 S.Ct. 1852, 64 L.Ed.2d 272 (1980); *Noble v. McClatchy Newspapers*, 533 F.2d 1081, 1090–91 (9th Cir.1975), *vacated on other grounds*, 433 U.S. 904, 97 S.Ct. 2966, 53 L.Ed.2d 1088 (1977); *Pollock & Riley, Inc. v. Pearl Brewing Co.*, 498 F.2d 1240, 1242–43 (5th Cir.1974), *cert. denied*, 420 U.S. 992, 95 S.Ct. 1427, 43 L.Ed.2d 673 (1975); *Semke v. Enid Auto. Dealers Ass'n*, 456 F.2d 1361, 1370 (10th Cir.1972); *Refuse & Envtl. Sys. v. Industrial Servs. of Am.*, 732 F.Supp. 1209, 1213 n. 5 (D.Mass.1990), *rev'd on other grounds*, 932 F.2d 37 (1st Cir.1991); *C. Albert Sauter Co. v. Richard S. Sauter Co.*, 368 F.Supp. 501, 518 (E.D.Pa.1973); *Webster Motor Car Co. v. Packard Motor Car Co.*, 135 F.Supp. 4, 10–11 (D.D.C.1955), *rev'd on other grounds*, 243 F.2d 418 (D.C.Cir.), *cert. denied*, 355 U.S. 822, 78 S.Ct. 29, 2 L.Ed.2d 38 (1957).

Without challenging this cornucopia of caselaw against them, defendants maintain that the law in this Circuit is to the contrary. They rely on two cases in this regard: *Bordonaro Brothers Theatres, Inc. v. Paramount Pictures, Inc.*, 203 F.2d 676 (2d Cir. 1953), and *Vinieris v. Byzantine Maritime Corp.*, 731 F.2d 1061 (2d Cir.1984). We discuss these cases in turn.

In *Bordonaro Brothers*, a successful antitrust plaintiff appealed the adequacy of damages, claiming error arising from the district court's comment on treble damages and the defense's argument that plaintiff would receive treble damages if victorious. In affirming the damage award, we concluded that there was no error because the treble damage provision was part of the statute, treble damages were pleaded in the complaint, and "reference either to the pleadings or to the governing statute is so usual a course in jury trial as to occasion no comment." 203 F.2d at 678. As is evident from the law's development since our decision in *Bordonaro Brothers* forty years ago, today one could hardly say that reference to treble damages "is so usual a course in jury trial as to occasion no comment." In this sense, time has passed by the *Bordonaro Brothers* decision, and the dominant and more-reasoned view is that juries should not be made aware of trebling provisions.

In addition, *Bordonaro Brothers* is distinguishable from the case at bar because in that case we held that allowing mention to the jury of the treble damages provision did not constitute reversible error; we did not hold that the refusal to permit such testimony required reversal. As Judge Mansfield noted in his dissent in *Vinieris*, *Bordonaro Brothers* "merely held that a trial judge's mention of treble damages in a civil antitrust suit is not reversible error since the damages were pleaded in the complaint. It did *not* hold that it is error for the judge to refuse to advise the jury of penal consequences, which

is the issue in this case." *See Vinieris,* 731 F.2d at 1072 (Mansfield, J., dissenting).

In *Vinieris,* neither the trebling provisions of the RICO statute nor the Clayton Act were implicated. At issue instead was a statute relating to the unlawful withholding of a seaman's back wages, 46 U.S.C. § 596, which has a draconian penalty provision that has been described as "both absurd and palpably unjust." *See Griffin v. Oceanic Contractors, Inc.,* 458 U.S. 564, 586, 102 S.Ct. 3245, 3258, 73 L.Ed.2d 973 (1982) (Stevens, J., dissenting). Vinieris argued to the jury that all he wanted was a ruling that defendants withheld the approximately $1400 owed to him, and nothing more. In reality, he was hoping for much more. Because of the excessive penalty provision, defendants would actually owe over $144,000, in excess of 100 times the amount claimed. The district court rejected the defendant's attempts to introduce the existence of the penalty provision. We found error in hiding from the jury the incentive of the plaintiff in bringing suit and the concomitant motive to lie, as well as the strong motivation of the ship captain not to withhold the wages.

The district court in *Vinieris* relied in part on the general rule in antitrust cases discussed above that juries should not be informed of the Clayton Act's trebling provisions. This court responded, in dicta, that the trial judge "was mistaken concerning this Court's position on disclosure in antitrust cases," and quoted the portion of *Bordonaro Brothers* cited above that "reference either to the pleadings or to the governing statute is so usual a course in jury trial as to occasion no comment." 731 F.2d at 1065.

*Vinieris* does not stand for the proposition that a reversal is required if a district court refuses to allow mention of a treble damage provision in the course of a RICO or antitrust suit. The statute in that case was so extraordinary, and the potential exponential penalties so remarkable, that it cannot usefully be compared to the trebling provisions of the RICO and antitrust statutes. Furthermore, the defendant in that case had another reason quite independent of impeachment to introduce evidence of the penalty provision. As we emphasized there, the

seaman's captain "was under very strict orders from his superiors to pay earned wages because of the very severe penalties involved and ... the Captain, himself, had a personal awareness of the possible consequences of his failure to pay. Permitting the Captain to testify only that it was important that wages be paid, without permitting him to explain to whom it was important and why, did not disclose the Captain's state of mind." 731 F.2d at 1064. Because the captain's knowledge of the penalty provision was relevant to the ultimate question of whether he actually paid the wages, we held it was error to prevent the jury from learning of the penalty provisions. *See In re: Air Disaster at Lockerbie Scotland on Dec. 21, 1988 (Pagnucco v. Pan American World Airways),* Nos. 1280, 1281, 1282, slip op. at 7447 (2d Cir. Jan. 31, 1994) (recounting that *Vinieris* was based on the fact that the statutory penalty was "relevant to the ship captain's state of mind in withholding wages"); *see also id.* at 7473–CC, —— (Van Graafeiland, J., dissenting) (explaining *Vinieris* in similar terms). No such competing interests are present in the antitrust and RICO contexts. To the extent that the dicta in *Vinieris* suggested that it is reversible error to preclude mention of a treble damage provision, we decline to follow it.

In conclusion, we hold that the district court did not abuse its discretion, and indeed followed the proper course, by precluding defendants' counsel from parading RICO's treble damage and attorneys fees provisions before the jury. We explicitly refrain from deciding whether there might be certain circumstances in which a district court could in its sound discretion permit mention to the jury of the prospect of treble damages and attorney fees.

## CONCLUSION

We have carefully considered the remainder of defendants' arguments and find them to be without merit. Accordingly, the judgment of the district court will be affirmed.