776 A.2d 849 (2001)
342 N.J. Super. 310
Paul ST. JAMES, Plaintiff-Appellant,
v.
FUTURE FINANCE, Creative Development Enterprises, and Airport Transportation, Defendants, and
David Walker, Defendant-Respondent, and
Florence Walker, Defendant-Third Party Plaintiff-Respondent-Cross-Appellant,
v.
Paul Thomas St. James, Third-Party Defendant.
Superior Court of New Jersey, Appellate Division.
Argued October 18, 2000.
Reargued April 4, 2001.
Decided June 18, 2001.
*851 Douglas S. Brierley, Morristown, argued the cause for appellant (Schenck, Price, Smith & King, attorneys; Mr. Brierley, Karin S. Riecker, Nancy M. Klingeman and Peter A. Marra, on the brief).
Steven J. Fram, Haddonfield, argued the cause for defendant-respondent David Walker and defendant-respondent-cross-appellant Florence Walker (Archer & Greiner, attorneys; Mr. Fram, on the brief).
Before Judges KING, COBURN and LEFELT.
*850 The opinion of the court was delivered by KING, P.J.A.D.

I
Plaintiff Paul St. James filed a complaint against his ex-wife, Florence Walker (defendant), her new husband, David Walker (Walker), and two companies the Walkers operated, Creative Development Enterprises (CDE) and Future Finance, Inc. Plaintiff sought the dissolution of a corporation he and defendant jointly owned, Sage Investment Corporation (Sage), and damages for defendant's and Walker's usurpation of Sage's corporate opportunities through Future Finance and CDE. Defendant filed a counterclaim seeking the dissolution of Sage, compensatory and punitive damages for plaintiff's breach of fiduciary duty, and separate damages under the New Jersey Racketeering Act, N.J.S.A. 2C:41-1 to -6.2 (N.J.RICO), and its federal analogue, 18 U.S.C.A. §§ 1961-1968, because of her ex-husband's actions with respect to Sage and his misuse of a license held by Paul Thomas Home Sales (PTHS) another corporation jointly owned by plaintiff and defendant.
The matter was bifurcated for trial; plaintiff appeals from judgments entered against him in both the Chancery Division and the Law Division. He appeals from the Chancery Division judgment which awarded the stock of Sage to defendant and divided Sage's assets, claiming that the judgment was against the weight of the evidence and the judge should have recused himself sua sponte before trial.
Plaintiff appeals from the Law Division judgment, in which a jury rejected his claims against defendant and awarded defendant compensatory damages, trebled under N.J. RICO, and punitive damages. He raises several arguments in this respect, asserting that: (1) the jury instructions were deficient because the jury was not told any compensatory damages awarded to defendant would be trebled; (2) the award of both trebled and punitive damages against him was improper; (3) the Law Division judge erred in collaterally estopping him from challenging certain findings of fact made by the Chancery Division judge in the first trial; (4) the N.J. RICO verdict was improper; (5) the verdict denying his claim, and awarding defendant damages, was against the weight of the evidence; and (6) the trial judge improperly allowed the admission of prejudicial bad acts evidence against him. Defendant cross-appeals from both judgments, arguing that both courts erred in refusing to award her attorney and expert fees.
We conclude that defendant cannot recover both treble damages and punitive damages and mold the verdict accordingly, allowing a set-off. We agree with plaintiff that defendant made an error in certain calculations, which error reduces defendant's actual damages by $24,265 or $72,795 when trebled under N.J. RICO. We also conclude defendant is entitled to additional expert fees of $15,728.45. With *852 those modifications to the Law Division judgment, the judgments are otherwise affirmed.

II
This is the procedural background. Plaintiff filed an eight count complaint against defendant and Walker in which he claimed that his ex-wife and Walker mismanaged two mobile home parks owned by Sage, Tilton Terrace (Tilton) and Delilah Terrace (Delilah), and engaged in fraudulent conduct when they received payments for expenses not actually incurred. Plaintiff sought an accounting of all money, equipment and employee services sold or transferred from Sage by either defendant, Walker, or the two companies which defendant and Walker operated, CDE and Future Finance. He also sought the appointment of his and defendant's son, Paul Thomas St. James (Paul Thomas) as Sage's "Provisional Director," an order restraining defendant or Walker from appearing at the Sage office, compensatory damages, and relief pursuant to N.J.S.A. 14A:12-7, the corporate deadlock statute. Plaintiff also claimed that defendant and Walker breached their fiduciary duties to him via their mismanagement of Sage, and sought the above relief. He further claimed that defendant and Walker usurped Sage's corporate opportunity, diverted assets belonging to Sage, and were unjustly enriched by obtaining economic benefits through business entities which rightfully belonged to Sage, and sought suitable relief.
Plaintiff's ex-wife filed an answer and counterclaim; in which she claimed that plaintiff breached the fiduciary duty he owed to her and Sage by disrupting Sage's operations through direct contact with tenants of the two trailer parks. She also claimed that plaintiff and Paul Thomas used a motor vehicle dealership license held by PTHS, which sold used and new mobile homes, without sharing the proceeds with her as a shareholder of PTHS. She sought the dissolution of PTHS or the forced sale of plaintiff's and Paul Thomas's shares in the corporation. She also sought disgorgement of all profits illegally retained by plaintiff and PTHS.
By order of Judge Gibson, defendant was permitted to file an amended counterclaim. She claimed that plaintiff's and Paul Thomas's retention of profits relating to their misuse of the PTHS license was accomplished through certain violations of both federal law, including wire fraud and mail fraud, and state law, including the falsification of documents generated by the sales of new mobile homes using the PTHS license. She claimed that plaintiff and Paul Thomas engaged in a pattern of racketeering under the Federal Racketeering Influenced and Corrupt Organizations Act, 18 U.S.C.A. §§ 1961-1968 (federal RICO), and N.J. RICO, N.J.S.A. 2C:41-1 to -6.2, and sought treble damages.
A bench trial before Judge Gibson began on April 2, 1996, but on April 16, 1996 the parties reached a settlement on the record. Plaintiff failed to close on the settlement, however, and defendant moved to enforce it. That motion was granted by Judge Gibson, who required plaintiff to proceed to closing on all transactions required by the settlement by January 2, 1997.
Meanwhile, defendant moved to require plaintiff to sell Sage to her. The hearing on that motion was conducted before Judge Gibson on January 31, 1997. At the conclusion of the hearing, Judge Gibson set aside the settlement. Defendant stipulated to a corporate deadlock, and agreed with plaintiff as to the value of Sage and its property. A trial date was set to determine how to split the assets of Sage between plaintiff and defendant.
*853 Judge Gibson ruled that after the trial regarding the division of Sage's assets was completed, the monetary claims between the parties would be transferred to the Law Division. Plaintiff was permitted to proceed pro se if his attorney chose to withdraw.
The trial recommenced before Judge Gibson, with plaintiff still represented by counsel. On June 11, 1997 the judge issued his opinion. Plaintiff received Delilah and defendant received Sage and Tilton, the more valuable of the parks. Plaintiff was to be paid $1.2 million, and an additional $200,000 representing the balance due on a debt of defendant's. In addition, the judge authorized the transfer of defendant's interest in PTHS to plaintiff, assuming the PTHS license could be transferred from the Sage office location to a location acceptable to plaintiff. If such a transfer could not be accomplished, PTHS was to be dissolved. The judge denied both parties' request pursuant to N.J.S.A. 14A:12-7(10) for counsel fees. On July 17, 1997 Judge Gibson issued an order transferring the remaining monetary claims related to PTHS and Future Finance/CDE to the Law Division.
On August 29, 1997 argument was conducted regarding defendant's motion to compel plaintiff to execute the documents necessary to effectuate the July 17, 1997 judgment. The judge granted the motion and ordered plaintiff to close within ten days. Plaintiff's motion for a stay pending appeal was denied. An order memorializing that opinion was issued the same day.
Plaintiff's motion for leave to appeal Judge Gibson's judgment, and for a stay pending the outcome of that appeal, was denied by this court on September 5, 1997. Plaintiff's motion for emergency relief to the Supreme Court was denied.
Before the Law Division trial began, plaintiff's counsel was permitted to withdraw, and plaintiff proceeded to trial pro se. Judge Seltzer entered an order sought by defendant, based on collateral estoppel, which set forth certain facts established during the Chancery Division proceeding before Judge Gibson and during certain other proceedings in which plaintiff was involved, which plaintiff would not be permitted to challenge during the Law Division proceedings.
Trial proceeded in the Law Division before Judge Winkelstein and a jury in February and March 1998. The jury rendered a verdict in which it rejected plaintiff's claims against defendant, Walker, Future Finance and CDE, and found that plaintiff had used the PTHS license for his personal benefit. The jury awarded defendant $728,152.50 in damages against plaintiff, and $5000 against Paul Thomas. Punitive damages of $2,000,000 were imposed by the jury against plaintiff following a brief hearing. A final judgment memorializing the verdict was entered on March 27, 1998. The compensatory damages were trebled to $2,184,457.50 based on the jury's conclusion that plaintiff violated N.J. RICO through his use of the PTHS license. Defendant was also awarded $119,606.48 in prejudgment interest, and $110,980.90 in counsel fees. The total award to defendant, including treble damages, punitive damages, prejudgment interest and counsel fees, was $4,453,044.88.
Plaintiff moved for a new trial; while that motion was pending, he filed for Chapter 11 bankruptcy relief and his assets were secured. The bankruptcy court permitted plaintiff to pursue the new trial motion, which was denied.
Plaintiff filed his notice of appeal, and defendant ex-wife thereafter filed her notice of cross-appeal, limited to her request for fees for both the Chancery and Law *854 Division proceedings. Paul Thomas did not appeal.

III-A

The Chancery Division Proceeding
Plaintiff held a Bachelor's degree in engineering; defendant was a high school graduate. In 1961, plaintiff and three other investors formed Sage, which was established to operate mobile home parks. They bought a park at that time which became known as Tilton. At the time, Tilton was a small park of ten acres, with twelve "pads," or mobile home sites. The park was enlarged from forty-five to fifty acres, and at the time of trial had 228 home sites. Defendant became involved with Sage in 1963; she and plaintiff married in July 1964. In 1986, Sage bought Delilah, comprised of forty acres and more than 300 home sites as of the time of trial.
Plaintiff ran Tilton for twenty-five years, developing the design of the park, physically improving it by using his engineering experience, filing applications to increase rents, and making the purchases to increase its size. He claimed that defendant assisted in sales and was in charge of the park records.
Plaintiff and defendant each also held a 49% interest in PTHS. The remaining 2% was held by Paul Thomas. PTHS was engaged in the leasing of equipment and sale of mobile homes. Its licensed location was at Tilton.
In June 1988, the parties divorced; the provisions of a Property Settlement Agreement (PSA) were incorporated into the divorce judgment. By this time, plaintiff and defendant were each 50% owners of Sage. The PSA provided, as to Sage, that each party would maintain their 50% interest in Sage, and would cooperate in its continued operation and management. Moreover, each party would share equally in Sage's debts, income and profits. Further, each party would receive $15,173 per month from Sage through salary, income, dividends or profits. However, the PSA provided that Sage's assets would be "put up for sale and the resulting net proceeds distributed equally" between them. This latter provision was placed in the PSA at defendant's insistence. They agreed to a divorce only if Sage was sold and her business interests untangled from plaintiff's. The parties agreed to set the price to sell Sage at $14.7 million. Also, as part of the divorce and PSA, plaintiff received two other properties, Egg Harbor River Resort (EHRR), a campground, and Stoney Fields, a mobile home park in poor condition. The provisions of the PSA dealing with PTHS will be described in detail below.
According to plaintiff, no adequate offers were received for the purchase of Sage; the best offers were for $7 million, far less than the $14.7 million dollar agreed-upon price. Defendant claimed that she was willing to sell Sage to one individual who offered $7 million in cash. She also would have accepted an offer, two weeks after that of $6.3 million. Plaintiff responded to neither offer. In fact, plaintiff admitted at trial that he changed his opinion regarding the sale of Sage because he believed the parks had not yet matured and a sale would not realize their full true value. Neither Sage nor the other parks were sold before this litigation began, even though defendant filed a motion at one point to compel a sale of Sage.
After the divorce, plaintiff decided to let defendant run Sage to gain experience. Plaintiff went to Arizona for four weeks, and began to put together a business, Bargaintown, essentially a vendor mall. Plaintiff spent his remaining time improving EHRR and Stoney Fields, the two parks he acquired pursuant to the PSA. *855 Immediately after the divorce was finalized, old homes in Stoney Fields were acquired by plaintiff, destroyed, and replaced with new homes. Plaintiff upgraded the park and it became one of the most desirable in South Jersey. Similarly, EHRR, a campground at the time of divorce, was improved; new mobile homes were placed on site and over $1 million was invested in the park by plaintiff. At the time of trial, it had 124 sites and forty to fifty new mobile homes. Plaintiff admitted that both parks encountered regulatory problems, including repeated violations of environmental standards issued by the Department of Environmental Protection (DEP) and the state and local departments of health (DOH).
Meanwhile, from 1988 to 1994, defendant was solely responsible for the operation of Sage and its two parks, Tilton and Delilah. Plaintiff claimed that running the parks was not a monumental task; rather, only a manager-bookkeeper and maintenance person were necessary. In fact, plaintiff claimed he could have operated Bargaintown in Arizona at the same time he operated Sage and its two parks.
Defendant, on the other hand, testified that plaintiff vanished after the divorce without telling her his destination, leaving her to run the parks by herself. She was initially overwhelmed at operating the parks on her own, but eventually adapted, learning as she went and finding solutions to the problems she encountered. Defendant testified, moreover, that operating the two parks was a difficult task; she not only collected rents and directed the maintenance person's activities, but also dealt with mobile home owners who rented to third parties (she screened potential renters), ran advertisements to sell available lots, handled delinquent accounts, and resolved environmental and other issues. She described the two parks as being like "mini-cities."
Moreover, because of the parks' poor financial situation, and the requirement that she pay plaintiff $15,173 per month pursuant to the PSA, she could not hire any additional assistance, relying only on herself, an office employee (Pam Mooney) and a maintenance man. However, in 1991, she married Walker, who had lived in Europe. In September of that year, he moved to New Jersey and began to assist in Sage's operation, such as environmental-regulatory problems, rent increases and obtaining a loan.
Defendant believed that she was a good manager of the parks. Debt service and costs were reduced, environmental issues addressed. Defendant's and plaintiff's monthly draw from Sage increased, from the $15,173 provided for in the PSA to between $30,000 and $35,000 per month by 1997. In addition, roads were paved, wells were upgraded, and other capital improvements were made. However, after the April 16, 1996 settlement fell apart, and during the bench trial before Judge Gibson, the parks deteriorated, because occupants left the park and defendant could not replace them, since plaintiff refused to approve any new tenants. Mooney corroborated defendant's allegedly active role in operating and improving the parks, while plaintiff had minimal involvement with the parks after the divorce. Plaintiff claimed, however, that under defendant's tenure Tilton had gone from one of the best parks in Atlantic County to one of the worst. In fact, he claimed the condition of both parks had deteriorated.
Paul Thomas lived with defendant after his parents divorced and had no contact with plaintiff. In September 1991, he began working at Sage for defendant, initially assisting with an oil spill that occurred at Tilton. After Walker became more involved *856 with the parks, Paul Thomas's duties decreased. Over time, Paul Thomas became closer to his father, and began to disapprove of certain business practices at Sage. Specifically, he claimed that bills went unpaid, that defendant and Walker falsified mortgage documents so new unit owners could be approved, and failed to perform appropriate credit checks. Also, the roads in the two parks were in disrepair, and Sage falsified chlorine test forms sent to the State regarding the park's well water. Defendant and Mooney specifically denied Paul Thomas's claims regarding falsification of chlorine reports.
Paul Thomas also testified that plaintiff received little information from defendant regarding Sage's operations. Moreover, court orders issued in June and August 1994 and in November 1995 restricted the times during which plaintiff could visit the Sage offices and ultimately enjoined him from going to Sage's offices at all. Paul Thomas then started telling plaintiff about the problems he perceived at Sage. Plaintiff became more interested and his son responded by providing even more detailed information. Ultimately, plaintiff allowed Paul Thomas to become a partner of his in the Bargaintown venture in Arizona, providing Paul Thomas with his own business opportunity. Paul Thomas was finally fired from his position at Sage by defendant for reasons irrelevant to this appeal, and admitted he had not seen defendant in the last few years before trial.
Substantial testimony was offered at trial regarding PTHS, its operation, and plaintiff's use of its license to buy and sell many homes in his two parks, EHRR and Stoney Fields. That testimony was largely repeated at the Law Division trial and will not be recounted here because irrelevant. Testimony regarding PTHS offered during the Chancery Division trial is relevant regarding collateral estoppel.
Judge Gibson issued a comprehensive opinion in which he required plaintiff to sell his interest in Sage to defendant but awarded Delilah to plaintiff, and required defendant to pay the cash difference between one-half of Sage's value and Delilah to plaintiff.

III-B

The Law Division Proceeding
The Law Division trial addressed plaintiff's claim that defendant, through Future Finance and CDE, had usurped a corporate opportunity available to Sage, and defendant's counterclaim that plaintiff used the PTHS license to buy and sell new mobile homes without splitting the profits with her as required by the PSA. Her amended counterclaim also alleged that plaintiff's scheme to retain all PTHS profits was accomplished via a pattern of racketeering in violation of federal and N.J. RICO, and sought treble damages. The facts regarding each claim are separately addressed.

1. Plaintiff's Claim.
Future Finance was established in 1992 as a way of involving Walker in defendant's mobile home business. Future Finance was designed to act as a broker between individuals buying and selling used mobile homes. According to Walker, Future Finance never sold new homes. Future Finance was owned solely by defendant. Defendant claimed that before her divorce, Sage did buy and sell used homes. This activity ceased in 1983.
Defendant claimed that plaintiff was not interested in brokering used mobile homes; rather, his interest was in clearing space at his parks for new homes, which he felt enhanced the value of the parks. Therefore, until 1994, plaintiff never complained about the activities in which Future *857 Finance engaged, nor did he seek a share of any profits earned by Future Finance, even though he was aware of its existence and activities. In fact, in 1992, when Future Finance prepared to enter into its first transaction, the rehabilitation and resale of a used mobile home, defendant asked Paul Thomas to seek plaintiff's approval for the activity; plaintiff did not object. Future Finance ceased brokering used homes in 1993 or 1994.
Walker had discussions with plaintiff, before the litigation began, during which they talked of Future Finance's business activities. Plaintiff told Walker he was aware that Future Finance was selling used homes at Sage, but never sought any share of Future Finance's profits.
According to Walker, Future Finance bought three or four abandoned homes, refurbished them, and sold them. The typical commission he received was between $500 and $1500, although as high as $6150. However, the larger commissions were frequently reduced by expenses incurred, or by a repayment of capital contributed towards the projects by Paul Thomas. Paul Thomas also aided in the rehabilitation of these homes and received one-half of any profits earned.
In addition, Future Finance introduced buyers to a bank which provided loans to the buyers; the company earned a fee of $900 for each of these transactions. Finally, Future Finance would link sellers of used homes with buyers, for which it earned a commission. Specifically, Future Finance would advertise for buyers, negotiate a sales price with potential buyers, and sometimes held money paid by a buyer to a seller until closing. In the typical situation (except for the rehabilitation of the three to four homes described above), Future Finance never held title to a home. Notably, Future Finance had a banking license which permitted it to engage in its activities.
Barry Shapiro, a C.P.A. who acted as accountant for Sage, defendant and Walker, testified that in 1992, according to Future Finance's financial documents, the corporation had gross earnings of $130,933, direct costs of $26,000, and a gross profit of $104,933. In 1993, gross earnings after direct costs were $28,697, and in 1994, the cost of Future Finance's activities exceeded its income. In sum, total gross income from 1992 through 1994 was approximately $131,000.
However, that sum did not include the indirect costs incurred by Future Finance during this period, including advertising, commissions paid to others, professional fees, and other expenses such as office, utility and automobile costs. Shapiro testified that when these latter costs were included, Future Finance's net profit was -$6852 in 1992, -$71 in 1993 and -$14,036 in 1994.
Paul Thomas, testifying on plaintiff's behalf, stated that Future Finance was formed after his mother married Walker to resell old homes and to assist in financing such sales. He worked for Future Finance, which earned money in two ways: by buying and selling used homes and by arranging financing for buyers, which was difficult to obtain in the mobile home market, and for which Future Finance charged a fee. Paul Thomas also claimed that if a new home was sold in a Sage park, Future Finance would obtain the financing necessary to upgrade the site, which was frequently required.
Paul Thomas testified that Future Finance brokered the sale of twenty to forty used homes per year, for the three or four years it operated. He earned approximately $20,000 in the Future Finance deals. He said that defendant did not tell him to keep Future Finance's activities *858 secret and Future Finance openly advertised its services. Finally, Paul Thomas testified that Future Finance used both its own office, and the Sage office, to conduct its business. He claimed that Sage employees rehabilitated a trailer, which served as Future Finance's office, which was located in a building across the street from the Sage office.
Plaintiff initially claimed that he was not aware of Future Finance's activities for some time, particularly since he was enjoined from going to the Sage office. He learned of the activity generally from Paul Thomas but did not realize the full extent of Future Finance's activities until he read depositions taken of defendant and Walker after the litigation started. He later admitted, on cross-examination, that he was aware of some of Future Finance's activities as early as 1992 yet did not seek a share of its profits until September 1994, soon after he received correspondence from defendant in 1994 seeking a portion of any profits earned by plaintiff through the use of the PTHS license. On rebuttal, plaintiff claimed he believed that Future Finance merely brokered the sale of used homes and arranged for financing, activities to which he did not object. He did object to Future Finance's actions in buying abandoned homes in Sage's parks and rehabilitating and selling them. Plaintiff felt that because Future Finance brokered deals within the Sage parks, or rehabilitated and sold used homes in Sage, he was entitled to a portion of any profits earned by it. He also felt this way because Future Finance utilized Sage's office and equipment.
The jury rendered a verdict which unanimously found that defendant did not usurp Sage's corporate opportunity by engaging in the brokering, purchase and sale of used mobile homes in Sage's two parks.

2. Defendant's Counterclaim

2(a). PTHS License
PTHS held a motor vehicle (MV) dealer's license which permitted it to buy and sell new mobile homes. PTHS's permanent licensed address was Tilton Terrace. The license expired on March 31, 1997.
Defendant, plaintiff and Mooney, Sage's office manager, generally agreed on the process by which mobile homes were bought and sold in New Jersey. Specifically, once a mobile home was ordered from a manufacturer, the unit was delivered to the dealer, here, PTHS, with its certificate of origin. Once the unit was sold by PTHS, the certificate of origin was signed by PTHS, the tax stamp affixed to the back of the certificate of origin, and the amount of sales tax paid was entered. If the unit was purchased in cash by the buyer, the certificate of origin was given to the buyer, who sent it to DMV and received in return a certificate of ownership. If financing was arranged by PTHS, then PTHS would send the certificate of origin to DMV, and sent a certificate of ownership to the buyer when the loan for the unit was satisfied.
The jury was instructed in detail regarding relevant provisions of the pertinent MV laws. Specifically, "new motor vehicle" is defined to include mobile homes. N.J.S.A. 39:10-2. "Dealer" is defined as the "agent, distributor or authorized dealer of the manufacturer of a new motor vehicle, and who has an established place of business." N.J.S.A. 39:10-2. N.J.S.A. 39:10-8 provides in pertinent part that:
When a new motor vehicle is delivered in this State by the manufacturer to his agent or a dealer, or a person purchasing directly from the manufacturer, the manufacturer shall execute and deliver to his agent or a dealer, or a person purchasing directly from the manufacturer, *859 a certificate of origin in the form prescribed by the director of motor vehicles, and no person shall bring into this State any new motor vehicle unless he has in his possession the certificate of origin as prescribed by the director. The certificate of origin shall contain the manufacturer's vehicle identification number and the motor number when used of the motor vehicles sold, name of the manufacturer, the manufacturer's shipping weight, a general description of the body, if any, the type and model and the gross vehicle weight rating.
When a new motor vehicle is sold in this State, the manufacturer, his agent or a dealer shall execute and deliver to the purchaser an assignment of the certificate of origin, with the genuine names and business or residence addresses of both stated thereon, and certified to have been executed with full knowledge of the contents and with the consent of both purchaser and seller.
An MV dealer's license must be obtained before a person can "engage in the business of buying, selling or dealing in motor vehicles" in New Jersey, except under certain irrelevant situations. N.J.S.A. 39:10-19. Each MV dealer license applicant must have established a permanent place of business, including a building at which motor vehicles can be serviced and displayed. N.J.S.A. 39:10-19.
Within ten working days of the purchase of a motor vehicle, the purchaser (if not a licensed dealer) must submit evidence of the purchase to the Division of Motor Vehicles (DMV), i.e., the certificate of origin. A certificate of ownership is then issued by DMV to the buyer. N.J.S.A. 39:10-11(A). Further, as instructions from DMV for completing a MV transaction provide, the certificate of origin must be stamped with a tax-satisfied stamp by the selling dealer. The dealer must also indicate the amount of sales tax already collected, or which will be collected before the next filing date for sales and use tax payments. Finally, the dealer must sign the certificate of origin before sending it to DMV.
Regulations adopted by DMV also require a licensed MV dealer to have an established, permanent place of business where motor vehicles can be displayed. N.J.A.C. 13:21-15.3(a). Any dealer who plans to change the location of its business must notify DMV in advance. N.J.A.C. 13:21-15.3(d). The regulations also require that a certificate of origin be delivered by the manufacturer to a dealer. N.J.A.C. 13:21-5.2. Finally, any person who knowingly presents to a public official a filing containing a false statement or information is guilty of a disorderly person's offense. N.J.S.A. 2C:21-3(b).
Two provisions of the PSA were relevant to defendant's counterclaim against plaintiff. Specifically, § 12.2 provided that each party agreed to continue to manage and operate PTHS "in conjunction with their continued ownership, operation and management of Sage ... and the real estate interest held through that corporation." That section also provided the parties agreed each would share equally "in the management and operation of [PTHS] and all wages, salary, income, profits, dividends or benefits, and that neither shall have any right to exclude the other from the operation of that entity." In addition, § 12.3 of the PSA provided that each party retained the right to "participate equally in any and all management decisions for that corporation." Further, the parties would alternate serving as president of the corporation, and neither could take any action as president without the consent of the others and the unanimous consent of all shareholders.
Plaintiff interpreted § 12.2 of the PSA to mean that if a deal using the PTHS *860 license involved a mobile home in one of Sage's two parks, then the profits from that transaction would be split between him and defendant. If plaintiff used the license to buy or sell a new home at one of his two parks, however, then he was not required by the PSA to divide his profits with defendant. However, he admitted that nothing in the plain language of the PSA, and specifically § 12.2, supported that interpretation. Plaintiff's interpretation of the PSA was particularly important to him, because he believed that the value of mobile home parks decreased as the homes aged. His business ideal at his parks was to remove and demolish older mobile homes and replace them with newer ones.
Defendant claimed that during the negotiations leading to the PSA, plaintiff never indicated that he intended to use the PTHS license to sell new homes in his two parks, EHRR and Stoney Fields. She interpreted § 12.2 to provide that the PTHS's license could not be used to buy or sell new homes outside of Sage's new parks. She and plaintiff, she thought, would share equally in the profits relating to any transaction in which the PTHS license was utilized. If the PTHS license was used outside of Sage, then, defendant was entitled to one-half of the profits flowing from any such transaction.
Because of his desire to upgrade his parks by replacing older homes with newer ones, plaintiff attempted, at about the time of the divorce, to obtain his own MV dealer's license. Plaintiff did so, notwithstanding his belief that he could use the PTHS license, because he wanted to honor defendant's desire that the couple separate their business interests. He wanted the permanent location for the license to be EHRR; however, a zoning variance would have been required to build the type of facility DMV required, and he decided not to pursue that course.
In 1989, about a year after the divorce, and during the time plaintiff attempted to secure his own MV dealer's license, defendant became concerned that plaintiff was using the PTHS license to buy and sell new mobile homes in EHRR and Stoney Fields. Her attorney wrote to plaintiff and informed him that plaintiff could not use the license or its related tax stamp for other than Sage business. Plaintiff admitted that he did not respond to this correspondence and was not aware whether his attorney did either.
Later, in August 1994, defendant, through her attorney, again sought from plaintiff information regarding whether he had obtained his own dealer's license, or whether he was using the PTHS license without sharing resulting profits with defendant. Plaintiff did not respond.
Ultimately, defendant sought a court order requiring plaintiff to provide her with detailed information regarding any transactions in which plaintiff engaged using the PTHS license, and an order to that effect was issued in January 1996; however, plaintiff did not comply. Therefore, another order was issued, about a week later, requiring plaintiff to provide such information immediately.
The background behind defendant's motion to compel plaintiff to provide evidence of his use of the PTHS license is enlightening. In count three, paragraph five of her counterclaim, she alleged that plaintiff used PTHS's license to buy and sell new mobile homes. Plaintiff denied the allegation. Similarly, when defendant attempted to learn through correspondence and the discovery process if plaintiff used the license, and to obtain any documents regarding such transactions, plaintiff responded that such questions were irrelevant, or claimed he could not recall details *861 of any transaction in which he bought or sold new homes. No documents were provided by plaintiff.
As of November 1995, plaintiff had still produced no documentation relating to any mobile home sales or purchases using the PTHS license. At a December 19, 1995 deposition, plaintiff denied using the PTHS license to buy and sell new homes in Stoney Fields.
However, about one month later, defendant and Mooney learned that plaintiff had been using the PTHS license to sell homes in his parks. PTHS had one tax stamp, with its MV dealer's license identification number. The correct license number for PTHS was 43518N. However, the tax stamp issued to PTHS incorrectly showed a license number of 43158N, the numbers one and five were reversed.
The stamp had always been kept by Mooney in her Sage office desk. According to Mooney, in 1988 plaintiff asked her for the stamp and made an imprint of it; he then returned the stamp. He also took the PTHS MV dealer's license off the Sage office wall and made a copy of it. The stamp did not thereafter leave the Sage office, and plaintiff did not ask for it again. Mooney related this episode to defendant, who asked plaintiff why he had taken an imprint of the stamp and copied the PTHS license. Plaintiff responded that he needed it.
Notably, plaintiff testified that although the stamp was generally located at the Sage office, he frequently took it to his office. He denied making his own copy of the stamp, by using the imprint he took of the original, and claimed there was only one PTHS tax stamp, of which he had possession. However, Mooney contradicted this testimony, and at trial, produced the stamp for the jury to inspect.
After this, defendant discovered that plaintiff had been using the PTHS stamp. In a notice sent by DMV to PTHS at its Tilton office, postmarked December 21, 1995, just days after plaintiff denied in a deposition having used the PTHS license at Stoney Fields, defendant and Mooney were informed that a particular certificate of origin could not be processed because the MV license identification number on the certificate was incorrect. The certificate of origin had been stamped with the incorrect identification number on PTHS's stamp, and was signed by plaintiff as president of PTHS. Moreover, the font on the stamp used in the transaction was different from the font on the stamp in Mooney's possession, the original PTHS tax stamp. PTHS sold five new homes in Sage which were undisputed, using the PTHS stamp. However, the December 1995 correspondence from DMV was the only time PTHS was informed that the wrong identification number had been stamped on a certificate of origin. In addition, the certificate of origin was issued to PTHS at plaintiff's address, and not at the Tilton address which was PTHS's permanent address. After this document came to the judge's attention, the January 1996 orders were issued requiring plaintiff to produce all documents regarding transactions engaged in by plaintiff in which the PTHS stamp was used.
At trial, plaintiff finally admitted using the PTHS license to buy and sell new homes in his two parks. He claimed that he and Paul Thomas did all the work, and advanced all of the money, involved in the transactions, and that the only connection between the sales and PTHS was his use of the PTHS license and tax stamp. Since defendant had expended no efforts with respect to these transactions, and because of his interpretation of the PSA, plaintiff claimed defendant had lost no money from his failure to share the profits *862 related to these transactions with her. Further, he had asked defendant if she wanted to participate in new home sales in his parks, and she had declined.
Plaintiff produced records relating to mobile home sales in EHRR and Stoney Fields using the PTHS license. Plaintiff was confronted with two certificates of origin resulting from sales using the PTHS license where the dealer was listed as EHRR, even though EHRR had no dealer's license. The certificates also used the PTHS license number and tax stamp. Plaintiff could not explain why he used the PTHS license and stamp, and claimed that EHRR was the dealer when it had no license. He merely said it was easier to complete the certificates in that manner. Moreover, other certificates of origin listed PTHS as the dealer, but with plaintiff's address, rather than PTHS's actual Tilton address.
Defendant reviewed all of the documents provided by plaintiff and produced an exhibit in which she attempted to demonstrate the profits plaintiff earned on these transactions. In doing so, she subtracted the contract price (the price paid to the buyer charged by plaintiff) from the invoice price (the price charged by a manufacturer to plaintiff) for each transaction, and then subtracted the tax due from PTHS on the sale. The profits for each transaction were then added together, producing a total profit, from sales made by EHRR and Stoney Fields using the PTHS license, of $1,023,248 and $433,057, respectively, for a total of $1,456,305.
Plaintiff attempted to counter this exhibit in part by arguing that defendant's calculations did not include other costs incurred in selling mobile homes and moving them into his parks, which would have reduced his total profits and any damages for which he might be liable. Specifically, he claimed that when he bought a new home, it would replace an older home sitting on a site at EHRR or Stoney Fields; thus, he incurred the costs of moving the old unit from the site and crushing and disposing of it. When the new home arrived, the site would be improved. In addition, he lost rent after the old home was removed, but before the new home was installed.
During a colloquy between the court and counsel on this issue, defendant said that these additional costs were sought in discovery, but were never provided to her. Thus, she was precluded by plaintiff from considering these costs in preparing her profit exhibit, and argued that plaintiff should not be able to present such costs to the jury at trial. In addition, she argued that many of the costs to which plaintiff alluded were not specific to any transaction, but improved the parks in general and should be discounted. Plaintiff responded that the court and jury could not simply ignore these costs.
The judge ruled that plaintiff was prohibited from presenting the additional costs to the jury, for several reasons. First, an expert would be needed to prove that the costs were specific to the transactions and were not related to the overall improvement of plaintiff's parks and any resultant increase in their value. Second, plaintiff was required by several court orders to produce all records regarding sales into his parks using the PTHS license and was deposed on the issue; he could not at trial rely on documents he had never produced. Finally, since plaintiff never provided the documents which could have demonstrated that he did incur these extra costs, defendant had no opportunity to prepare for plaintiff's "additional costs" argument, and would have to retain an expert to address this issue if plaintiff were allowed to present these costs to the jury. Notably, plaintiff admitted that he could *863 only guess as to how to precisely allocate the extra costs between the specific transactions and the parks in general.
Defendant conceded that the costs used in her profit analysis, i.e., the invoice cost to plaintiff and his selling price to a buyer, did not include costs incurred by plaintiff such as the cost to attach the new home to a water supply, the cost of required permits, and other costs related to preparing a site for a new mobile home. She pointed out, however, that she did not include his additional costs in calculating plaintiff's profit per sale because she was not provided with any evidence of such costs, such as bills or permit costs. Moreover, defendant pointed out that all new homes do not incur separate site preparation costs, since the site where a new home is located may have recently been upgraded.
Defendant called an expert witness, Donald DeGrazia, C.P.A., to testify regarding violations of federal and state law committed by plaintiff via his transactions using the PTHS license. In reaching his conclusions, DeGrazia relied on documents provided by plaintiff, which he presumed were accurate. Of particular interest, N.J. RICO defines "racketeering activity" to include state tax law violations. N.J.S.A. 2C:41-1(k).
DeGrazia concluded that plaintiff violated both federal and state tax laws, by under-reporting income, failing to report all profits earned on PTHS transactions, and failing to report interest income earned on deals in which he financed the buyer's purchase of a new mobile home. In addition, plaintiff underpaid sales tax due on the sale of houses. Plaintiff also improperly assigned income earned by PTHS, a corporation, to EHRR, a sole proprietorship. In sum, DeGrazia concluded that plaintiff under-reported federal and state income taxes in the amount of $468,533.65.

2(b). PTHS Shareholder Meeting
In a related matter, a meeting of the PTHS shareholders was called on November 3, 1995. During the meeting, a newslate of directors was elected, by a vote of two (plaintiff and Paul Thomas) to one (defendant). The three directors elected for a one-year term were plaintiff, Paul Thomas, and Paul Thomas's wife, Joy St. James. Defendant was removed as a director.
The new Board immediately held a meeting at which plaintiff was elected president, Paul Thomas vice president, and Joy St. James secretary-treasurer. Defendant was not present at this meeting, since she was no longer on the Board.
These actions were taken notwithstanding the provisions in the PSA which provided that plaintiff and defendant would share equally in PTHS's management, and neither could exclude the other "from the operations of [PTHS]." Further, the PSA provided that plaintiff and defendant retained the right to "participate equally in any and all management decisions for [PTHS]."
Plaintiff claimed that defendant was removed from the Board, and was not voted as an officer, because she did not want to renew the PTHS license, and because she wanted to dissolve the corporation. He admitted, however, that the corporate actions of November 1995 took place during the very time when defendant was attempting to learn about plaintiff's use of the PTHS license in his own parks. He conceded he was aware of the provisions of the PSA. Defendant testified that she was never told why she was relieved from the Board or not elected as an officer.

2(c). The Verdict
The jury was charged regarding N.J. RICO, not federal RICO. N.J. RICO defines *864 "racketeering activity" to include any of a number of enumerated crimes under New Jersey law, including murder, forgery and fraudulent practices, violations of the State's tax laws, as well as "any conduct defined as `racketeering activity' under [federal RICO]." N.J.S.A. 2C:41-1. "Racketeering activity" under federal RICO includes any threat involving murder, any criminal act related to mail or wire fraud, or obstruction of justice. 18 U.S.C.A. § 1961.
Under N.J. RICO, it is unlawful "for any person employed by or associated with any enterprise engaged in or activities of which affect trade or commerce to conduct or participate, directly or indirectly, in the conduct of the enterprise's affairs through a pattern of racketeering activity...." N.J.S.A. 2C:41-2(c). "Any person damaged in his business or property by reason of a violation of N.J.S. 2C:41-2 may sue therefor in any appropriate court and shall recover threefold any damages he sustains and the cost of the suit, including a reasonable attorney's fee, costs of investigation and litigation." N.J.S.A. 2C:41-4(c).
The jury found that plaintiff used PTHS for his personal benefit, and that he had violated N.J. RICO through his improper use of the PTHS license. Defendant was awarded $728,152.50 in compensatory damages, which were trebled under N.J. RICO to $2,184,457.50, and $2,000,000 in punitive damages. Her total award, including prejudgment interest and counsel fees, was $4,415,044.88.
[We redact IV, V and VI in which we affirm the judgment in the Chancery action in all respects. These sections of our opinion do not meet the criteria for publication. R. 1:36-2(d).]

VII
We turn to the issue of the interrelationship of the award of treble damages plus punitive damages, two species of exemplary damages. The jury awarded $728,152.50 in compensatory damages and $2,000,000 in punitive damages. After RICO trebling, the compensatory damages came to $2,184,457.50. Defendant also recovered $119,606.48 in prejudgment interest and $110,980.90 in counsel feesa total of $4,415,044.88. Plaintiff contends that the jury's award of both treble damages and punitive damages to defendant constituted an improper duplication of punitive damages. He asserts that the punitive award should be vacated, the treble damages should be reduced by two-thirds, or the matter should be remanded so defendant can elect which of these options to select.
Plaintiff raises two related arguments in this respect. First, he argues that because treble damages under RICO are punitive, a separate and additional award of punitive damages was unfair and should be reversed. Second, he claims that because defendant's RICO and common law claims were based on the same course of conduct, and since defendant suffered only one injury, defendant should not receive two awards.
In general, damages are characterized as either punitive or remedial. Treble damages, however, contain both punitive and remedial elements. Robert S. Murphy, Arizona RICO, Treble Damages, and Punitive Damages: Which One Does Not Belong?, 22 Ariz. St. L.J. 299, 302 (1990). Some scholars believe that if RICO permits treble damages for punitive purposes, then an additional and separate award of punitive damages allows an impermissible double recovery. William H. Kaiser, Extortion in the Workplace: Using Civil RICO To Combat Sexual Harassment in Employment, 61 Brook. L.Rev. 965, 980 (1995). However, the *865 courts have yet to definitively determine this issue. Id. at 981.
In Shearson/American Express, Inc. v. McMahon, 482 U.S. 220, 240, 107 S.Ct. 2332, 2345, 96 L.Ed.2d 185, 203 (1987), the Supreme Court noted that the "legislative history of § 1964(c) [of federal RICO] reveals the same emphasis on the remedial role of the treble-damages provision [as does that provision of the federal anti-trust law]." In addition, the Court noted that the legislative drafters of federal RICO's treble damages provision "sought to provide vigorous incentives for plaintiffs to pursue RICO claims that would advance society's fight against organized crime." 482 U.S. at 241, 107 S.Ct. at 2345, 96 L.Ed.2d at 203.
In Liquid Air Corp. v. Rogers, 834 F.2d 1297, 1310 n. 8 (7th Cir.1987), cert. denied, 492 U.S. 917, 109 S.Ct. 3241, 106 L.Ed.2d 588 (1989), the Seventh Circuit held that "[a]lthough there is some sense [that federal] RICO treble damages are punitive, they are largely compensatory in the special sense that they ensure that wrongs will be redressed in light of the recognized difficulties of itemizing damages." Earlier, the Seventh Circuit had held that the treble damages provision of federal RICO may promote "more complete satisfaction of plaintiffs' claims" by producing fairer settlements. Haroco v. American Nat'l Bank & Trust Co. of Chicago, 747 F.2d 384, 399 n. 16 (7th Cir.1984), aff'd, 473 U.S. 606, 105 S.Ct. 3291, 87 L.Ed.2d 437 (1985). The Seventh Circuit also held that § 1964 of federal RICO was "remedial not punitive and is of a type traditionally granted by courts of equity." United States v. Cappetto, 502 F.2d 1351, 1357 (7th Cir. 1974).
In a more recent case, a federal district court held, in the context of deciding whether a RICO claim survived a defendant's death, that "[a]lthough the treble damages provision of a civil [federal] RICO suit may suggest a punitive element, the overriding purpose of RICO is to provide a remedy for persons injured as a result of racketeering activity." First American Corp. v. Al Nahyan, 948 F.Supp. 1107, 1122 (D.D.C.1996). In reaching that conclusion, the court relied on the language of federal RICO which indicates that the statute should be liberally construed to effectuate its remedial purposes. Ibid.
On the other hand, many courts have reached the opposite conclusion regarding the nature of treble damages under federal RICO. The Third Circuit noted that although federal RICO was intended to compensate innocent victims, its "overall purpose [was] to thwart the generalized harm wrought by racketeering activity, its dependence on statutory crimes, and the mandatory provision for treble damages are sufficient evidence of Congress' intention that the treble damages provision serve a predominantly punitive purpose." Genty v. Resolution Trust Corp., 937 F.2d 899, 913-14 (3d Cir.1991).
Federal district courts have also concluded that federal RICO's treble damages provision is punitive rather than remedial in nature. E.g., Toucheque v. Price Bros. Co., 5 F.Supp.2d 341, 350 (D.Md.1998) (prevailing view is that RICO's treble damages provision is punitive in nature); Pine Ridge Recycling, Inc. v. Butts County, Georgia, 855 F.Supp. 1264, 1273 (M.D.Ga. 1994) (federal RICO's treble damages provision is punitive); Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Jana, 835 F.Supp. 406, 413 n. 8 (N.D.Ill.1993) (treble damages under federal RICO are punitive).
Federal courts are similarly divided as to whether the treble damages provision of non-RICO federal laws are punitive or remedial. See Murphy, supra, 22 Ariz. St. L.J. at 322 n. 134. Some federal courts *866 have concluded that punitive and treble damages are not both available under other federal acts, including anti-trust and banking laws. Id. at 320-21.
Although the Law Division judge in the case before us obliquely referred to this issue in his March 1998 opinion, in the context of deciding if prejudgment interest was available to defendant, he did not expressly address it. He also did not address this precise issue when denying plaintiff's motion for a new trial on this basis.
When courts have concluded that treble damages under federal RICO are punitive, and that separate punitive damages are therefore unavailable, they have uniformly held only that treble and punitive damages cannot both be awarded for a federal RICO claim. See, e.g., Moravian Development Corp. v. Dow Chemical Co., 651 F.Supp. 144, 149-50 (E.D.Pa.1986) (no basis for permitting punitive damages and treble damages under a federal RICO claim). However, independent state claims under which punitive damages are sought can proceed. For example, in Bingham v. Zolt, 823 F.Supp. 1126, 1135 (S.D.N.Y.1993), aff'd, 66 F.3d 553 (2d Cir. 1995), cert. denied sub nom. Steinberg v. Bingham, 517 U.S. 1134, 116 S.Ct. 1418, 134 L.Ed.2d 543 (1996), the court held that a punitive damage award based on a civil federal RICO claim was not appropriate, since the treble damages provision of that statute was also punitive. However, a punitive award was appropriate for non-RICO claims, even if treble damages were awarded under federal RICO. Because it was impossible to determine from the jury's verdict whether the punitive damages awarded to plaintiff were based on plaintiff's RICO or non-RICO claims, the punitive damages award was reduced, but not reversed, in order to deter defendant and others from engaging in similar wrongful non-RICO acts.
Similarly, in In Re VMS Securities Litigation, 752 F.Supp. 1373, 1380 (N.D.Ill. 1990), plaintiffs filed federal securities law, federal RICO, and various state law claims. The court granted defendant's motion to strike plaintiffs' request for punitive damages on the federal claims, because punitive damages were not recoverable under the securities law, and because under federal RICO, treble damages constituted the extent of the damages plaintiff could claim. Id. at 1404. However, defendant's motion to strike plaintiffs' state law claims for which punitive damages could be awarded was denied. Ibid.
A federal district court in California reached a similar conclusion. Southwest Marine, Inc. v. Triple A Machine Shop, Inc., 720 F.Supp. 805, 810 (N.D.Cal.1989) (punitive damages not available under federal RICO, because treble damages are punitive). The Ninth Circuit has interpreted Southwest Marine only as barring a plaintiff from obtaining punitive and treble damages directly through a RICO claim. However, plaintiff was not barred from seeking punitive damages under separate, non-RICO, state law claims. Neibel v. Trans World Assurance Co., 108 F.3d 1123, 1130 (9th Cir.1997).
In Standard Chlorine of Delaware, Inc. v. Sinibaldi, 821 F.Supp. 232, 252-53 (D.Del.1992), the district court agreed that plaintiff could not obtain punitive and treble damages under federal RICO, given the punitive nature of the treble damages provision. However, the court rejected defendant's contention that plaintiff's non-RICO, state law claims, under which punitive damages could be awarded, should also be stricken. A district court in New York agreed with this conclusion. Com Tech Assocs. v. Computer Assocs. Internat'l, Inc., 753 F.Supp. 1078, 1093 *867 (E.D.N.Y.1990) (rejecting defendant's motion to strike plaintiff's request for punitive damages under state law), aff'd, 938 F.2d 1574 (2nd Cir.1991).
In the case before us the trial judge made clear in denying plaintiff's motion for new trial on this point, that he believed the punitive damages awarded to defendant were not given pursuant to her N.J. RICO claim. Rather, he stated that, "this punitive damages award was not in conjunction with the RICO claim. I made that clear to the jury, but I still don't think [plaintiff] understands it. It was strictly limited to the claim for breach of fiduciary duty and the jury was so instructed." After discussing the evidence in support of the jury's verdict regarding defendant's non-RICO state claims, the judge reiterated that, "I note again the punitive damages award was not for the RICO claim. It was for the breach of fiduciary duty claim, and case law supports awards of both when they are on two separate claims."
A review of the verdict form makes clear that the jury found in favor of defendant on both her RICO claim and state law breach of fiduciary duty claim. Further, the jury responded "yes" to question 12 regarding an award of punitive damages to defendant:
If you have found that [plaintiff] and/or [Paul Thomas] have breached fiduciary duties owed to [defendant], in other words you answered `YES' to questions 4 and 5, and/or 6 and 7, do you find that an award of punitive damages is warranted based upon that breach?
Further, as the judge noted, the jury was specifically and carefully instructed in this respect. That is, the jury was told that defendant could not be awarded separate punitive damages for a N.J. RICO violation and for a breach of fiduciary duty violation. Defendant could be awarded punitive damages, but only if she proved that plaintiff breached his fiduciary duty to defendant and Sage. The jury was told that no punitive damages could be awarded for a RICO violation. The judge then explained the purpose of punitive damages, and how the jury should determine if they were appropriate.
In short, defendant was not awarded punitive damages and treble damages on her RICO claim; rather, she was awarded compensatory damages which were trebled under her RICO claim. She was then awarded punitive damages under her breach of fiduciary duty claim. Plaintiff's reliance on case law prohibiting an award of punitive and treble damages under a RICO claim is misplaced.
Nevertheless, plaintiff argues that because the RICO and breach of fiduciary duty violations were part of the same, ongoing and continuous course of conduct and transactional relationship, separate treble and punitive damage awards are duplicative and inappropriate. This issue presents a close question but on this point we agree with plaintiff, especially because of the single lump-sum award of compensatory damages.
One commentator has stated that "a plaintiff cannot punish a defendant more than once for the same conduct and a plaintiff cannot reap more punitive-type damages than the trier of fact has imposed." Murphy, supra, 22 Ariz. St. L.J. at 302. In the context of federal antitrust law, the Third Circuit has held that when federal antitrust and state tort claims are premised on the same financial losses and a single course of conduct by defendants, plaintiff cannot recover the same lost "profits twice or thrice over for each legal theory advanced in favor of liability." Fineman v. Armstrong World Indus., Inc., 980 F.2d 171, 218 (3d Cir.1992), cert. denied, *868 507 U.S. 921, 113 S.Ct. 1285, 122 L.Ed.2d 677 (1993). Similarly, in Super-Turf, Inc. v. Monsanto Co., 660 F.2d 1275, 1283-84 (8th Cir.1981), the Eighth Circuit held that under federal antitrust law, a claimant cannot be awarded punitive and treble damages for the same course of conduct by defendants, even if the treble damages were sought under federal antitrust law while the punitive damages were sought under a state law claim.
The Fifth Circuit has held that when a plaintiff alleges federal securities law and federal RICO violations for which he or she seeks compensation, based on the same course of conduct by defendants, plaintiff cannot be awarded compensatory damages under the securities law and separate treble damages under federal RICO. Abell v. Potomac Ins. Co., 858 F.2d 1104, 1141 (5th Cir.1988), cert. denied sub nom. Abell v. Wright, Lindsey & Jennings, 492 U.S. 918, 109 S.Ct. 3242, 106 L.Ed.2d 589 (1989).
In Holmberg v. Morrisette, 800 F.2d 205, 206-08 (8th Cir.1986), cert. denied, 481 U.S. 1028, 107 S.Ct. 1953, 95 L.Ed.2d 526 (1987), plaintiffs filed a multi-count complaint, alleging RICO and state law claims, based on a common course of conduct committed by defendants. In remanding the case for a new determination of damages, the court noted that
a recovery of compensatory damages on both the fraud and conversion claims clearly would be duplicative and should not be allowed. [Plaintiff] has suffered only one injury-the wrongful drawing down of his letter of credit-and is entitled to be compensated for that injury only once. Similar reasoning applies to the question of punitive damages on both the fraud and conversion claims. Fraud and conversion are separate legal theories of liability, but in reality defendants have injured [plaintiff] only once. Accordingly, they are to be punished only once, not as many times as there are separate legal theories that have been found to fit the case.
[Id. at 212.]
However, the Ninth Circuit held that a plaintiff may receive both treble damages under federal RICO and state law punitive damages, even when both claims are predicated on the same course of conduct committed by defendant. Neibel v. Trans World Assurance Co., 108 F.3d at 1131. In reaching that conclusion, the court relied on a provision of federal RICO that provides that "nothing in [Federal RICO] shall supercede any provision of ... State... law ... affording civil remedies in addition to those provided for in this title." Id. at 1130.
The judge here found that plaintiff did not engage in the same course of conduct in violating N.J. RICO and breaching his fiduciary duty. That is, the breach of fiduciary duty claim was based on facts including: (1) plaintiff's and Paul Thomas's action in removing defendant from the board and as an officer of Sage at the November 3, 1995 meeting; (2) the note written by Paul Thomas memorializing plaintiff's comments regarding what he intended to do to defendant as a result of her litigation; (3) plaintiff's use of a different name than PTHS to buy and sell homes; and (4) plaintiff's "borrowing" of the PTHS stamp, a copy of which he later used in buying and selling homes. On the other hand, the RICO violation stemmed from his racketeering activity (i.e., tax fraud and perhaps mail/wire fraud), which injured defendant, i.e., through profits from PTHS which plaintiff withheld. Thus, an argument can be made that plaintiff engaged in different but parallel conduct in violating N.J. RICO and in violating the fiduciary duty he owed to defendant.
*869 On the other hand, one could also argue that defendant suffered only one injury, namely the profits earned through PTHS by plaintiff in selling mobile homes which he failed to share with defendant. A recovery of both treble and punitive damages would be duplicative under this premise.
In this situation, where defendant suffered a single, monetary injury, reflected by the unitary compensatory award of $704,887.50, (as modified below for computation errors), the trebling effect plus the punitive award clearly presents the likelihood of some duplication of exemplary or punitive consequences. The law in this area is not well-settled. See Linda L. Schlueter and Kenneth R. Redden, Punitive Damages § 21.2(L), at 509-510 (4th ed.2000) (courts reached "conflicting conclusion."). We agree with the cases which suggest that the amount of the punitive damages awarded to defendant should be reduced by two-thirds of the N.J. RICO award to reflect the duplicative punitive aspect of the overall award, when modified to correct errors in the original compensatory damage award of $728,152.50, or $2,000,000-(2 × $703,887.50)=$591,425, the net punitive damage award. This brings defendant's total overall damage verdict to $2,110,862.50 for the RICO claim + $592,225 for punitive damage claim or $2,703,087.50.
We so modify the exemplary or punitive damage award to this extent. See Abell v. Potomac Ins. Co., 858 F.2d at 1140-41 (reducing securities fraud compensatory damage award by amount of duplicative compensatory RICO award). In Super-Turf, Inc. v. Monsanto, 660 F.2d at 1284, the Eighth Circuit held that the trial judge should have submitted a special verdict form which would have permitted the court to mold a verdict to eliminate its duplicative aspects (i.e., treble damages under RICO and punitives under a state law claim). Similarly, in Al Kazemi v. General Acceptance & Investment Corp., 633 F.Supp. 540, 543-44 (D.D.C.1986), plaintiff was awarded trebled RICO damages and punitives on the basis of state claims. The punitive award was reduced to reflect the award of trebled damages. See Bingham, 823 F.Supp. at 1135 (punitive award reduced by 3/4's to reflect treble damage award). We conclude this result reflects the competing interests and values at stake: adequate punitive consequences for a wrongful course of conduct and fundamental fairness for the wrongdoer exposed to duplicative damages. See Cooper Indus., Inc. v. Leatherman Tool Group, Inc., ___ U.S. ____, 121 S.Ct. 1678, 149 L.Ed.2d 674 (2001) (federal constitutional requirement of de novo review of punitive damage awards).

VIII
Plaintiff next claims that the judge's jury instructions were deficient in two respects. First, the judge failed to tell the jury, before it considered compensatory damages, that the award would be trebled. Second, the judge failed to instruct the jury before punitive damages were considered that any compensatory damages would be trebled. We disagree with plaintiff in both respects and affirm on this point.
Plaintiff raised the first argument during the hearing at trial before the trial judge. He rejected that argument, relying on HBE Leasing Corp. v. Frank, 22 F.3d 41 (2d Cir.1994). The judge again relied on that decision in denying plaintiff's new trial motion on this basis. To the extent that defendant argues that plaintiff did not raise this issue at the trial level, we disagree.
This is a close question. No New Jersey case has decided this issue with respect to a claim under N.J. RICO. However, *870 federal courts have addressed this issue in the context of federal RICO. In Liquid Air Corp. v. Rogers, 834 F.2d at 1308 n. 7, the Seventh Circuit held that defendants' objection to the trial judge's refusal to allow them to explain the treble damages provision of RICO to the jury was meritless. Rather, the court held that "[s]uch information is irrelevant to a jury's deliberations and may confuse or prejudice the jury. It is properly excluded."
In HBE Leasing Corp., 22 F.3d at 45, defendants wanted to put before the jury the treble damages provision of federal RICO, in order to demonstrate that plaintiff's witnesses had a motive to lie, so as to obtain "the bonanza" of a treble damages award. The Second Circuit rejected that claim, holding that:
We ... now remove any doubts within our own Circuit that district courts should not as a general matter permit reference before the jury to the fact that any eventual award will be trebled under the statute or that attorneys fees will be awarded to a prevailing party....
While the defendants may have been deprived of some incremental benefit in not being able to use the RICO provisions for impeachment purposes, the question is one of degree. Plaintiffs were seeking over $5 million dollars in compensatory damages plus punitive damages. Defendants were free to argue that the amount of damages before trebling provided a powerful incentive to fabricate. Any incremental benefit of allowing comment before the jury of the RICO trebling and attorneys fees provisions as additional reasons to lie would be greatly outweighed by the costs of permitting such mention. Reference to treble damages ... is irrelevant to the jury questions of liability and damages and may tend to confuse or prejudice a jury into reducing its eventual award, thus frustrating Congress's goal of deterring improper conduct by assessing treble damages.

[Ibid. (emphasis added).]
The Second Circuit in HBE Leasing Corp. also cited to other cases construing this issue, noting that "[e]very authority brought to this court's attention upholds excluding references to trebling ... in the RICO context." Id. at 45-46. Finally, the court noted that the same rule applies in the context of federal antitrust law. Id. at 46. However, the court did state at the end of its opinion that it "explicitly refrain[ed] from deciding whether there might be certain circumstances in which a district court could in its sound discretion permit mention to the jury of the prospect of treble damages." Id. at 47.
Most recently, in Admiral Mortgage, Inc. v. Cooper, 357 Md. 533, 745 A.2d 1026 (2000), an employee brought a state action to recover unpaid commissions from his former employer; the statute upon which the employee relied also authorized an award of treble damages. Id. at 1027. One of the principal issues before the court was whether the trial judge erred in allowing the jury to determine the issue of treble damages. Ibid. In addressing that issue, the Maryland High Court noted that in some statutes, the trebling provision is mandatory. Id. at 1033. In those cases, the court noted that
[t]he prevailing practice under the Federal antitrust and RICO statutes is for the jury to determine the compensatory damages and for the judge then to apply the automatic multiplier and triple that amount. Indeed, the Federal courts have held, in both antitrust and RICO actions, that it is error for the jury even to be told about the trebling provision. The automatic trebling provision has been held to be "irrelevant to *871 the jury's deliberations," and concern has been expressed that informing the jury of the provision may cause it to adjust its compensatory award and thus distort its true function of finding damages. That view prevails notwithstanding that neither the antitrust nor the RICO statute specifies whether the trebling is to be done by the judge or the jury.
[Id. at 1034 (citations omitted).]
However, where trebling is "discretionary, rather than fixed, there is no basis for a concern that the jury might be inclined to find less in compensatory damages than otherwise would be justified, for it would remain in control of any additional statutory award." Ibid. Because the statute in question in Admiral Mortgage involved a discretionary trebling award, ibid., the Maryland court concluded that it was not error for the jury to have decided the "extent of additional damages" awarded to plaintiff. Id. at 1035.
Plaintiff concedes that under the available case law, a jury should not be instructed in federal RICO or antitrust cases that damages will be trebled. Nevertheless, he stresses New Jersey cases which require an "ultimate outcome charge." Roman v. Mitchell, 82 N.J. 336, 345, 413 A.2d 322 (1980), involved a negligence claim molded under the Comparative Negligence Act in favor of defendant, who was found only twenty-five percent negligent. The Supreme Court held that "a jury informed of the legal effect of its findings as to percentages of negligence in a comparative negligence trial is better able to fulfill its fact finding function"; therefore, an ultimate outcome charge was appropriate there. However, in a complex case, the trial judge can with discretion choose to withhold the instruction if it would mislead the jury. Id. at 345-46, 413 A.2d 322. Plaintiff also relies on State v. Mejia, 141 N.J. 475, 485, 662 A.2d 308 (1995), where the Court held that a trial judge must inform the jury of the effect of their findings in a criminal context. However, Mejia, a capital criminal case, is clearly inapplicable. Moreover, the Roman Court observed that in a complex case the trial judge may choose not to provide such information to the jury if it would mislead them. Notably, it was that very potential to mislead a jury which led the federal court in HBE Leasing Corp. to conclude that a jury should not be informed of federal RICO's trebling provision. 22 F.3d at 45.
Plaintiff also relies on a recent decision of this court, Wanetick v. OCT Partnership, 318 N.J.Super. 156, 723 A.2d 100 (App.Div.1999), aff'd in part, rev'd in part on other grounds, Wanetick v. Gateway Mitsubishi, 163 N.J. 484, 750 A.2d 79 (2000). We held that in the context of a Consumer Fraud Act claim, "an ultimate outcome charge is necessary here to aid the jury in its fact-finding role." Id. at 165, 723 A.2d 100. However, the Wanetick panel declined to hold that the failure to provide an ultimate outcome charge constituted reversible error, and reversed on other grounds. Id. at 166-67, 723 A.2d 100.
Although the Supreme Court reversed our ruling in Wanetick, it explicitly affirmed our holding that in a Consumer Fraud Act case, a trial judge "must instruct jurors concerning the ultimate outcome of their verdicts in cases arising under the Consumer Fraud Act and tried after the date of this opinion [May 10, 2000]." 163 N.J. at 496, 750 A.2d 79. (The case before us was tried in February and March 1998.) The Court largely adopted our reasoning in concluding that an ultimate outcome charge in consumer fraud cases will not prejudice defendants or the thinking of some jurors, and that *872 jurors should be informed of "the legal effect of their actions." Id. at 489-95, 750 A.2d 79.
The Court, however, expressly stated that an ultimate outcome charge is not required in complex cases involving multiple defendants. Id. at 495, 750 A.2d 79. However, the Court also reversed our judgment remanding the case to the trial judge, holding that neither the failure to give the ultimate outcome charge, or the purported error regarding the trial court's jury instructions upon which this court decided the case, constituted reversible error. Id. at 496-97, 750 A.2d 79.
Justice Coleman dissented, because "knowledge that the judge will treble the economic damages is not only irrelevant to the jury's performance of its function, but such knowledge likely will be prejudicial to the plaintiff while at the same time thwarting the legislative intent of requiring exemplary damages." Id. at 498, 750 A.2d 79.
We conclude that Wanetick does not require reversal here. First, the case did not involve, nor did the Court even discuss, the issue of an ultimate outcome charge in a RICO or antitrust setting. Rather, it explicitly limited its prospective holding to cases brought under the Consumer Fraud Act. Because all federal courts who have addressed the issue in the RICO context have concluded that such a charge is not appropriate, we find Wanetick is inapplicable, as well as prospective only. The Supreme Court also recognized that in a complex case, such a reference to trebled damages can be omitted if it would mislead the jury; this, of course, is the main reason federal courts have disapproved of such a reference in RICO cases.
Finally, we could readily agree with Justice Coleman that giving such an instruction would be prejudicial to a claimant and is irrelevant to the jury's "performance of its function" in RICO cases like the one confronting us. Notably, this is the same rationale used by the court in HBE Leasing Corp., which led the Second Circuit to hold that an ultimate outcome charge should not be given in RICO cases. 22 F.3d at 45. Although Justice Coleman's dissent does not control us, we believe his opinion has merit regarding complicated RICO cases with pendent state law claims.
Plaintiff also asserts that the judge should have told the jury, before it considered defendant's request for punitive damages, that any RICO award would be trebled. This again is also a close question. Plaintiff raised the issue during a pretrial hearing, but was told that the jury would not be instructed as to RICO's trebling provision. Even if error, this had no potential for harm because the punitive award here was not disproportionate and is molded to suit the circumstances of this particular case.
The Punitive Damages Act, N.J.S.A. 2A:15-5.9 to -5.17, provides in relevant part that in determining the amount of punitive damages to award, a jury should consider "all relevant evidence, including, but not limited to the following ... (4) the financial condition of the defendant." N.J.S.A. 2A:15-5.12(c)(4).[1] Cases decided prior to the Punitive Damages Act have *873 also held that the defendant's financial condition is a relevant factor to consider in assessing punitive damages. Herman v. Sunshine Chem. Specialties, Inc., 133 N.J. 329, 339, 627 A.2d 1081 (1993); Ripa v. Owens-Corning Fiberglas Corp., 282 N.J.Super. 373, 397, 660 A.2d 521 (App. Div.), certif. denied, 142 N.J. 518, 665 A.2d 1111 (1995). Under the Act,
[b]efore entering judgment for an award of punitive damages, the trial judge shall ascertain that the award is reasonable in its amount and justified in the circumstances of the case, in light of the purpose to punish the defendant and deter that defendant from repeating such conduct. If necessary to satisfy the requirements of this section, the judge may reduce the amount of or eliminate the award of punitive damages.

[N.J.S.A. 2A:15-5.14(a) (emphasis added).]
A jury's punitive damage award should be overturned as excessive only in clear cases. Smith v. Whitaker, 313 N.J.Super. 165, 202, 713 A.2d 20 (App. Div.), aff'd, 160 N.J. 221, 734 A.2d 243 (1998). Plaintiff claims this is such a case, because the jury was unaware that its compensatory award would be trebled, and therefore had an inaccurate picture of his actual financial condition as required by case law and the Punitive Damages Act.
Nevertheless, we reject plaintiff's argument. First, in HBE Leasing Corp., 22 F.3d at 45, the Second Circuit noted that the jury should not be informed that any damages it awarded would be trebled under federal RICO, even though plaintiffs there were also seeking punitive damages. Therefore, the fact that punitive, as well as compensatory, damages were sought by plaintiff did not alter the trial judge's belief here that mentioning RICO trebling to the jury would only "tend to confuse or prejudice the jury into reducing its eventual award." Ibid.
Second, the trial judge rejected this claim in denying plaintiff's motion for a new trial. Specifically, the judge held that there was "really no basis to attack" the two-million dollar punitive damage award as excessive. Rather, the jury had before it plaintiff's financial statement, showing a net worth of over ten million dollars as of the end of 1996. Plaintiff's claim that his net worth was actually far less was unsupported by any evidence in the record, even though plaintiff was on notice that such evidence would be required if a jury concluded that punitive damages were warranted. Moreover, the punitive award was less then three times the compensatory damages awarded to defendant, and was well within the limit set forth in the Punitive Damages Act (punitive damages awards cannot exceed five times compensatory damages award; N.J.S.A. 2A:15-5.14(b)). Thus, the judge, without directly saying so, followed the mandate of N.J.S.A. 2A:15-5.14(a) by determining that the award was reasonable in its amount.
Moreover, in Herman v. Sunshine Chem. Specialties, Inc., 133 N.J. at 345, 627 A.2d 1081, the Supreme Court determined that a defendant's "financial condition" for purposes for deciding a punitive damages award, "roughly means the ability to pay." Here, defendant did not contend that he was unable to pay the two million dollar punitive damage award together with a trebled compensatory award. In fact, the only evidence of plaintiff's net worth at trial showed that it was over ten million dollars. Thus, he would, at least then, have been in a position to pay both the punitive and trebled compensatory awards. Any failure of the jury to consider the impact of the trebled compensatory damages award, in deciding on the amount *874 of punitives he should pay, seems harmless in hindsight. And again, our modification of the punitive award by a credit for the trebled RICO award exemplary element amply serves as a retrospective remedy for any potential abuse by the jury in this circumstance. [We redact IX, X, XI, XII, XIII, XIV, XV, XVI which treat trial errors claimed by plaintiff in the Law Division trial. We found no reversible error in the Law Division trial. These points do not meet the criteria for publication. R. 1:36-1(d).]

XVII
We affirm the judgment in the Chancery Division. We affirm but modify the Law Division judgment to reduce the compensatory damages awarded to defendant by $24,265 or $72,795 when trebled. We reduce the $2,000,000 punitive damage award by the trebling effect of the RICO award to $592,225, for a total damage award of $2,703,887.50. We also modify the Law Division judgment by awarding defendant $15,728.75 in expert witness fees. The prejudgment interest on the compensatory award must be recalculated by the parties or settled by the trial judge on remand. Affirmed, as modified, and remanded for entry of a modified judgment, including post-judgment interest.
NOTES
[1] The Punitive Damages Act took effect 120 days after October 27, 1995, L. 1995, c. 142, § 11, but applies "to causes of action filed" on or after October 27, 1995. Model Jury Charge (Civil), 6-20, "Damages-Punitive" (1995). Even though probably technically inapplicable to this matter, since plaintiff's complaint was filed on September 26, 1994 and defendant's initial counter-complaint was filed in October 1994, the legislation does offer some guidance on this issue since it was prospectively effective by the time of the Law Division trial.